No. 10-56465

===============================================

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

===============================================

AMERICAN TRUCKING ASSOCIATIONS, INC.

*Plaintiff-Appellant,*

v.

THE CITY OF LOS ANGELES, THE HARBOR DEPARTMENT OF THE CITY OF LOS ANGELES, THE BOARD OF HARBOR COMMISSIONERS OF THE CITY OF LOS ANGELES,

*Defendants-Appellees.*

On Appeal from the United States District Court
For the Central District of California
The Honorable Christina A. Snyder, District Judge
Case No. CV 08-04920 CAS (CTx)

===============================================

BRIEF OF APPELLANT
AMERICAN TRUCKING ASSOCIATIONS, INC.

===============================================

Christopher C. McNatt Jr.
cmcnatt@scopelitis.com
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, LLP
2 North Lake Avenue, Suite 460
Pasadena, California 91101
Tel: (626) 795-4700
Fax: (626) 795-4790

Robert Digges
rdigges@trucking.org
Chief Counsel, ATA Litigation Center
AMERICAN TRUCKING
ASSOCIATIONS, INC.
950 North Glebe Road
Arlington, VA 22203
Tel: (703) 838-1889
Fax: (703) 838-1705

W. Stephen Cannon
scannon@constantinecannon.com
Seth D. Greenstein
sgreenstein@constantinecannon.com
Evan P. Schultz
eschultz@constantinecannon.com
CONSTANTINE CANNON LLP
1301 K Street NW, Suite 1050 East
Washington, D.C. 20005
Tel: (202) 204-3500
Fax: (202) 204-3501

Counsel for Plaintiff-Appellant,
AMERICAN TRUCKING
ASSOCIATIONS, INC.

## CORPORATE DISCLOSURE STATEMENT
### (Federal Rule of Appellate Procedure 26.1)

The undersigned counsel for American Trucking Associations, Inc. ("ATA") states that ATA has no parent corporation, and no publicly held corporation owns stock in the association.

DATE:     December 28, 2010     SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, LLP

By: /s/ *Christopher C. McNatt Jr.*
Christopher C. McNatt Jr.

Attorneys for American Trucking Associations, Inc.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ ii

TABLE OF AUTHORITIES ...................................................... vii

GLOSSARY ................................................................. xiii

STATEMENT OF JURISDICTION ............................................. 1

STATEMENT OF THE ISSUES ................................................ 2

STATEMENT OF THE CASE .................................................. 3

STATEMENT OF FACTS ....................................................... 6

    A.    ATA and its Members............................................. 6

    B.    POLA and the Port Drayage Industry...................... 6

    C.    POLA's Expansion Plans........................................ 8

    D.    The POLA Concession Agreement ......................... 8

SUMMARY OF ARGUMENT ................................................. 15

STANDARD OF REVIEW ...................................................... 17

ARGUMENT ....................................................................... 18

I.    The District Court Erroneously Held that the Concession Agreement and Individual Concession Provisions Do Not Relate to Prices, Routes, or Services. ....................................................... 18

    A.    Section 14501(c)(1) Preempts POLA's Concession Agreement in Toto. ............................................................... 19

    B.    The Financial Capability Provision is Preempted Because It Affects the Prices, Routes, or Services of Motor Carriers. ..... 24

    C.    The Maintenance Provision of POLA's Concession Agreement Affects the Prices, Routes or Services of Motor Carriers

Because It Regulates the Essential Details of Motor Carrier Services. ................................................................ 25

D.   The Placard Provision of POLA's Concession Agreement Is Preempted by Section 14506(a). ........................................... 27

II.   The District Court's Reversal on the Market Participant Defense Violates Congressional Intent and This Court's Precedent. .............. 28

A.   The District Court's Initial Opinion Correctly Stated and Applied the Market Participant Doctrine. ............................... 30

1.   The District Court initially correctly held that POLA's Concession Agreement does not constitute proprietary state action. ................................................ 31

2.   The District Court initially correctly held that the Concession Agreement does not reflect "efficient procurement." ........................................... 31

3.   The District Court also correctly held, initially, that the Concession Agreement does not satisfy the "narrow scope" test. ................................................ 34

B.   This Court Praised and Affirmed the District Court's Initial Market Participation Discussion, which therefore Became Law of the Case. ........................................................ 35

C.   The District Court's Market Participation Conclusions Make Fundamental Legal Errors, and Conflict with this Court's Precedent. ........................................................ 37

1.   The District Court erroneously held that "efficient procurement" does not require actual procurement. ..... 38

2.   The District Court erroneously held that the Supreme Court's Wunnicke decision is not binding, despite Ninth Circuit precedent to the contrary. ................................. 43

3.   The District Court erroneously held that the appropriate market is the one for port services, when precedent limits

the appropriate analysis to the narrow drayage services market. ........................................................................ 45

4.  The District Court erred by holding that the Concession Agreement is essentially proprietary. ........................... 47

5.  The District Court erroneously held that attempts to avert litigation are proprietary actions. .................................. 48

6.  The District Court's decision ignores that POLA's actions seek to advance traditional goals of government, not business. ............................................................... 50

7.  No allegedly new facts justified the District Court's departure from its initial correct decision. .................... 52

D.  This Court Should Hold That POLA's Concession Plan Does Not Qualify under the "Narrow Scope" Prong of the Market Participant Doctrine. .............................................. 54

III.  The District Court Ignored Statutory and Case Law Reserving to the Federal Government the Right to Revoke Carriers' Ability to Participate in Interstate Commerce at the Port of Los Angeles. ........ 55

A.  POLA Cannot Revoke Drayage Carriers' Interstate Authority on Safety Grounds. ............................................... 56

B.  Reform Of Motor Carrier Regulation Did Not Extinguish Exclusive Federal Control Over Safety-Related Suspension Or Revocation Of Interstate Operating Authority. ...................... 57

IV.  The District Court Improperly Applied the Motor Vehicle Safety Exception to Preemption to Provisions Not Genuinely Responsive to Safety. ............................................................................ 62

A.  The Maintenance Requirements Are Not Genuinely Related To Safety. .................................................................... 63

B.  The Placard Requirement Is Prohibited By Section 14506(a), Which Has No Safety Exception. ........................................... 65

CONCLUSION ........................................................................ 67

Statutory Appendix A ................................................................... 69

Statutory Appendix B ................................................................... 70

Statutory Appendix C ................................................................... 73

# TABLE OF AUTHORITIES

## CASES

*Aeroground, Inc. v. City and County of San Francisco*,
  170 F. Supp. 2d 950 (N.D. Cal. 2001) .................................. 32, 42, 46, 48

*Air Transp. Ass'n of Am. v. San Francisco*, 266 F.3d 1064
  (9th Cir. 2001).......................................................................... 22, 23, 24

*Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995) ................... 44

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
  557 F. Supp. 2d 1110 (C.D. Cal. 2008) ........................................... *passim*

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009)......................................................... *passim*

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 2009 WL 1160212 (C.D.
  Cal. Apr. 28, 2009)..................................................................... 4, 20, 58

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
  596 F. 3d 602 (9th Cir. 2010) ................................................................ 5

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 2010 WL 3386436 (C.D.
  Cal. Aug. 26, 2010)......................................................................... *passim*

*Antilles Cement Corp. v. Vila*, 408 F.3d 41 (1st Cir. 2005) ........................ 43

*Atlantic Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders
  of Atlantic County*, 48 F.3d 701 (3d Cir. 1995) ...................................... 44

*Automated Salvage Transp., Inc. v. Wheelabrator Environmental Sys., Inc.*,
  155 F.3d 59 (2d Cir. 1998)..................................................................... 43

*Big Country Foods, Inc. v. Bd. of Educ. of the Anchorage School
  Dist.*, 952 F.2d 1173 (9th Cir. 1992)....................................................... 43

*Castle v. Hayes Freight Lines, Inc.*, 348 U.S. 61 (1954) ................. 56, 57, 58

*Chance Mgmt., Inc. v. State of S. Dakoka*, 97 F.3d 1107
  (8th Cir. 1996)...................................................................................... 44

vii

*City of Columbus v. Ours Garage & Wrecker Serv. Inc.*,
　536 U.S. 424 (2002) ............................................................. 57

*Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Marketing Bd.*,
　298 F.3d 201 (3d Cir. 2002) ................................................. 44

*Crescent Towing & Salvage Co. v. Ormet Corp.*, 720 So. 2d 628
　(La. 1998) ............................................................. 33, 36, 42

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) ............................... 43

*Endsley v. City of Chicago*, 230 F.3d 276 (7th Cir. 2000) ........................... 44

*Engine Mfrs. v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031
　(9th Cir. 2007) ............................................................. *passim*

*Florida Transp. Serv., Inc. v. Miami-Dade County,* 2010 WL 4484094
　(S.D. Fla. Nov.2, 2010) ......................................................... 33

*Florida Transp. Serv., Inc. v. Miami-Dade County*, 543 F. Supp. 2d 1315
　(S.D. Fla. 2008) ........................................... 32, 33, 34, 42, 45

*Four T's, Inc. v. Little Rock. Mun. Airport Comm'n*, 108 F.3d 909
　(8th Cir. 1997) ............................................ 33, 36, 37, 41, 44

*Golden State Transit Corp. v. City of Los Angeles*,
　475 U.S. 608 (1986) ............................................................. 46

*GSW, Inc. v. Long County*, 999 F.2d 1508 (11th Cir. 1993) ........................ 44

*Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794 (1976) ........................... 39

*Huish Detergents, Inc. v. Warren County, Ky.*, 214 F.3d 707
　(6th Cir. 2000) ................................................................. 44

*Inc. Village of Rockville Center v. Town of Hempstead*, 196 F.3d 395
　(2d Cir. 1999) ................................................................. 43

*Indep. Charities of Am., Inc. v. State of Minn.*, 82 F.3d 791
　(8th Cir. 1996) ................................................................. 44

*Klitzke v. Steiner Corp.*, 110 F.3d. 1465 (9th Cir. 1997) ...................... 56, 60

*Lodi Truck Serv., Inc. v. United States*, 706 F.2d 898 (9th Cir. 1983) .........56

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .......................21

*Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999)..........43

*New England Legal Found. v. Massachusetts Port Authority,*
    883 F.2d 157 (1st Cir. 1989) ................................................................23

*Pharm. Research and Mfrs. of Am. v. Concannon*, 249 F.3d 66
    (1st Cir. 2001).......................................................................................43

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am.*
    *v. U.S. Dep't of Agric.*, 499 F.3d 1108 (9th Cir. 2007) ..........................37

*Red River Serv. Corp. v. City of Minot*, 146 F.3d 583 (8th Cir. 1998).........44

*Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364,
    128 S. Ct. 989 (2008).................................................................*passim*

*Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052 (9th Cir. 1987).........43

*South-Central Timber Develop., Inc. v. Wunnicke,*
    467 U.S. 82 (1984)........................................................................*passim*

*SSC Corp. v. Town of Smithtown*, 66 F.3d 502 (2d Cir. 1995)....................44

*Swin Res. Sys., Inc v. Lycoming County, Pa.*, 883 F.2d 245
    (3d Cir. 1989).......................................................................................44

*Tocher v. City of Santa Ana*, 219 F.3d 1040 (9th Cir. 2000)..................36, 41

*Transport Limousine of Long Island, Inc. v. Port Auth. of N.Y.*
    *and N.J.*, 571 F. Supp. 576 (E.D.N.Y. 1983) ............................33, 36, 41

*Twentieth Century Fox Film Corp. v. Entm't Distributing,*
    429 F.3d 869 (9th Cir. 2005)................................................................17

*United States v. McConney*, 728 F.2d 1195 (9th Cir. 1984) .......................18

*USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, (2d Cir. 1995) ......44

*White v. Mass. Council of Constr. Emp'rs., Inc.*, 460 U.S. 204 (1983)........47

## FEDERAL STATUTES

28 U.S.C. § 1291...............................................................................1

28 U.S.C. § 1331...............................................................................1

28 U.S.C. § 1651...............................................................................1

42 U.S.C. § 1983...............................................................................3

46 U.S.C. § 70103(c)(3)(C)..............................................................50

46 U.S.C. § 70105.............................................................................50

49 U.S.C. app. § 2512......................................................................72

49 U.S.C. app. § 2512(d) .................................................................72

49 U.S.C. § 10922(a) ........................................................................69

49 U.S.C. § 10922(c) ........................................................................70

49 U.S.C. § 10922(f).........................................................................70

49 U.S.C. § 10925(c) ........................................................................71

49 U.S.C. § 13902...............................................................................6

49 U.S.C. § 13902(a)(1).....................................................................69

49 U.S.C. § 13905(e) ........................................................................71

49 U.S.C. § 14501(c) ................................................................*passim*

49 U.S.C. § 14501(c)(1)..........................................3, 18, 19, 57

49 U.S.C. § 14501(c)(2)(A) .........................................5, 12, 56, 57

49 U.S.C. § 14504a(c).........................................................................1

49 U.S.C. § 14506................................................................. 1, 65, 66

49 U.S.C. § 14506(a) ........................................................ 27, 65, 68

49 U.S.C. § 31136..................................................................6

49 U.S.C. § 31142..................................................................6

49 U.S.C. § 31144............................................................61, 69

49 U.S.C. § 31144(b) ...........................................................72

ICC Termination Act, Pub. L. No. 104-88 (Dec. 29, 1995),
    109 Stat. 803 ..................................................................59, 60

Motor Carrier Safety Act of 1984, Pub. L. No. 98-554, Title II,
    98 Stat. 2829 ...........................................................60, 61, 72

Trucking Industry Regulatory Reform Act of 1994,
    Pub. L. 103-311, Title II, 108 Stat. 1678 ...........................58, 59, 61, 70

H.R. Rep. No. 104-311 (1984), *reprinted in* 1995
    U.S.C.C.A.N. 793 ...............................................................60

## STATE STATUTES

Cal. Pub. Res. Code §§ 21000, *et. seq*..........................................49

Cal. Veh Code § 34505.6, Historical Statutory Notes .................................61

Cal. Veh. Code § 34505.6(a)....................................................61

## OTHER AUTHORITIES

Cal. Air Resources Board, Goods Movement Emission Reduction Program
    http://www.arb.ca.gov/bonds/gmbond/gmbond.htm
    (last visited Dec. 27, 2010)....................................................51

Cal. Air Resources Board, http://www.arb.ca.gov/homepage.htm
    (last visited Dec. 27, 2010)....................................................50

18 Charles Alan Wright & Arthur R. Miller, Fed. Prac. &
  Proc. § 4478.5 (2002)..............................................................................37

# GLOSSARY

For convenience, ATA sets forth below a list of citation forms and commonly-used abbreviations used in this brief:

Trial Exhibits are identified as "Ex. ___" followed by the citation to the Excerpts of Record ("ER___").

Witness testimony will be cited as follows:

- The witness' last name

- A roman numeral signifying the trial day

- The transcript page number, followed by a colon and the referenced lines in the transcript testimony

- The citation to the Excerpts of Record within brackets

"BHC" means the Board of Harbor Commissioners of the Port of Los Angeles.

"CAAP" means the Clean Air Action Plan (*infra* at 8).

"CTP" means the Clean Trucks Program (*infra* at 8).

"FAAAA" means the Federal Aviation Administration Authorization Act of 1994.

"IOO" means an independent owner-operator (*infra* at 7).

"LMC" means a licensed motor carrier (*infra* at 6 n.2).

"MTO" means a marine terminal operator (*infra* at 7).

xiii

## STATEMENT OF JURISDICTION

This action arises under the Supremacy Clause of the Constitution, Article VI, clause 2; the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501(c); 49 U.S.C. § 14504a(c); 49 U.S.C. § 14506; and the All Writs Act, 28 U.S.C. § 1651. The United States District Court for the Central District of California had original subject matter jurisdiction under 28 U.S.C. § 1331.

On September 15, 2010, following a bench trial on the merits, the District Court entered final judgment in favor of Defendants City of Los Angeles, Los Angeles Harbor Department and Los Angeles Board of Harbor Commissioners ("POLA") and against Plaintiff ATA on all counts of its Complaint. Excerpts of Record ("ER")1. ATA filed a Notice of Appeal of this Order on September 16, 2010. ER71. This Court has jurisdiction under 28 U.S.C. § 1291.

1

## STATEMENT OF THE ISSUES

(1)    Did the District Court erroneously hold that use of a Concession Agreement to control which federally-licensed motor carriers ("LMCs") may participate in interstate commercial drayage operations on Port property does not affect price, routes, or services of an LMC and, so, would not be preempted under 49 U.S.C. § 14501(c)?

(2)    Did the District Court erroneously exempt POLA's regulatory activities under the judicially-created "market participant" defense based on "efficient procurement," where POLA neither participates in the affected drayage market nor procures drayage services, and where POLA's actions promote governmental policies rather than proprietary interests?

(3)    Did the District Court erroneously grant POLA the right to revoke LMCs' right to engage in interstate commerce, a power reserved solely to the federal government?

(4)    Did the District Court erroneously apply the 49 U.S.C. §14501(c) motor vehicle safety exception to federal preemption to provisions that were not genuinely safety-related?

2

## STATEMENT OF THE CASE

On July 28, 2008, ATA filed the Complaint against POLA and Defendants City of Long Beach, Long Beach Harbor Department, and Long Beach Board of Harbor Commissioners ("POLB").[1] ER446-517.  Count I alleged that the POLA and POLB Concession Plans would deny entry to the Ports, as of October 1, 2008, to any LMC that refused to sign a Concession Agreement, were  "related to the prices, routes, or services" of those LMCs and therefore preempted under 49 U.S.C. § 14501(c)(1). Count II asserted similar claims against provisions contained only in POLA's Concession Agreement. Count III alleged the Concession Plans and the manner of their enforcement imposed an undue burden on interstate commerce, in violation of the Commerce Clause, giving rise to a cause of action under 42 U.S.C. § 1983.

On July 30, 2008, ATA moved for a preliminary injunction on Counts I and II. Dkt. 13; ER 1040.  The District Court denied ATA's motion on September 9, 2008. ER263-288 (*Am. Trucking Ass'ns, Inc. v. City of Los Angeles,* 557 F. Supp. 2d 1110 (C.D. Cal. 2008) ("*ATA-I*"). ATA appealed.

---

[1]    POLB entered into a settlement with ATA and was dismissed by stipulation on October 20, 2009.  As part of the settlement, POLB replaced its Concession Agreement with a "Registration and Agreement" that eliminated the elements objected to by ATA. Ex. 163, ER571-575; Wargo V-162:4–163:2[ER1027-1028]; Whalen I-147:17-155:13[ER930-938].

On March 20, 2009, this Court reversed. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles,* 559 F.3d 1046 (9th Cir. 2009) (*"ATA-II"*). This Court determined ATA was likely to establish on the merits that the Concession Agreement was preempted in whole or in part and had made the necessary showing on the remaining three injunction factors, and remanded the case to the District Court for a provision-by-provision preemption and severability analysis. *ATA-II*, 559 F.3d at 1057, 1059-1060. The Court affirmed the District Court holding that Defendants' actions were not likely to be exempt from preemption under the "market participant" doctrine. *Id.* at 1053.

On April 3, 2009, ATA filed a Motion on Remand for Entry of a Preliminary Injunction with respect to Counts I and II, and requested that the Concession Agreement be enjoined in full. Dkt. 114; ER1040. On April 28, 2009, the District Court entered an Order denying ATA's request to enjoin the Concession Agreements in their entirety, but preliminarily enjoining the several provisions this Court found likely to be preempted on the merits. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 2009 WL 1160212 (C.D. Cal. Apr. 28, 2009) ("*ATA-III*"), ER221-262. On May 14, 2009, ATA appealed the partial denial of the injunction. Dkt. 158; ER1040. On February 24, 2010, this Court affirmed in part and reversed in part the

District Court's Order. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles,* 596 F. 3d 602 (9th Cir. 2010) (*"ATA-IV"*).

Trial on the merits was held between April 20-29, 2010. On August 26, 2010, the District Court issued Findings of Fact and Conclusions of Law, *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 2010 WL 3386436 (C.D. Cal. Aug. 26, 2010) ("*ATA-V*" or "Conclusions") holding, *inter alia*:

- POLA's promulgation of the Concession Agreement could escape FAAAA preemption within the ambit of the market participant defense;

- The FAAAA otherwise would preempt Concession Agreement bans against use of independent owner-operator drivers and on-street parking, but not the Agreement in its entirety or provisions relating to proof of financial capability, maintenance, or mandatory display of placards;

- The maintenance and placard provisions also would be exempt from preemption under the Section 14501(c)(2)(A) "motor vehicle safety" exception; and,

- POLA's ability to use the Concession Agreement to revoke a LMC's right to provide drayage services on Port property was not preempted by federal statutory and case law.

Judgment for POLA and against ATA's claims was entered September 15, 2010. ER1. This appeal is taken from that judgment and the underlying Conclusions.

## STATEMENT OF FACTS

### A.    ATA and its Members

ATA is the non-profit national trade association for the trucking industry and is a federation of affiliated state trucking associations, conferences and organizations that includes more than 37,000 LMC members representing every type and class of LMC in the country.[2]  The Intermodal Motor Carrier Conference ("IMCC") is an affiliated conference of the ATA.  IMCC members include LMCs that provide drayage trucking services to and from the Ports of Los Angeles and Long Beach.

### B.    POLA and the Port Drayage Industry

The Port of Los Angeles operates as a department of the City of Los Angeles.  The Port is managed by a Board of Harbor Commissioners ("BHC") that has authority to manage Port assets for the benefit of the

---

[2]    "Motor carrier" refers to an individual, partnership, or a corporation engaged in transportation of goods.  LMCs engaged in interstate commerce receive operating authority from the Department of Transportation ("DOT") pursuant to the registration provisions of the federal Motor Carrier Act, 49 U.S.C. § 13902, and must comply with safety regulations and inspection requirements promulgated under the Federal Motor Carrier Safety Act, 49 U.S.C. §§ 31136, 31142.

regional economy, and to enforce rules and regulations within the Harbor district.

POLA does not operate the cargo handling facilities at the Port. POLA is a "landlord port" that leases space to private marine terminal operators ("MTOs") who load and unload cargo containers. ER14-15 at ¶¶16-17. Revenue supporting POLA operations comes primarily from property leases and tariff fees, *e.g.*, levies on pilotage, dockage, wharfage, and passengers. Ex. 188, ER711-725.

LMCs dray cargo containers from ships to customers, to off-dock terminals, or to railheads for further transport, and vice versa. ER13-14 at ¶ 10. LMCs contract directly with cargo owners, ocean carriers, railroads, or others in the transport chain. POLA does not participate in these drayage contracts. ER15 at ¶¶ 18-20; Ex. 49, ER520542. A large number of LMCs provide customers with drayage services to and from the Port under subcontracts with independent owner operators ("IOOs") of drayage trucks. Holmes-IV-159:20-160:11[ER1005-1006]; Ex.183 at 15, ER615. LMCs are legally responsible for IOO performance and truck compliance to the same extent as employees and company-owned equipment. 49 U.S.C. §31132(2). Sandberg-I:207:10-25[ER939], 209:7-25[ER940]; Sandberg II-36:10–46:20[ER943-953]. IOOs are more productive and efficient providers of

drayage service than employees, and are highly reliable. Patterson-III-43:22-44:2[ER972-973]; Stefflre-III-176:9-182:20[ER986-992]

## C.    POLA's Expansion Plans

To improve its competitiveness against other ports, POLA sought to construct and expand terminal facilities for lease to new and existing MTOs. Environmental groups concerned about increased air pollution, including Intervenors, opposed POLA's efforts. In response, POLA adopted a comprehensive Clean Air Action Plan ("CAAP") in November 2006, which addressed every category of port-related emission source—ships, trucks, trains, cargo-handling equipment, and harbor craft. Ex. 268, ER840-883.

## D.    The POLA Concession Agreement

The "Clean Truck Program" ("CTP") elements of the CAAP, embodied in Tariff No. 4, focused on "three fundamental, crucial public interest needs: 1) cleaner air; 2) homeland security; and 3) a reliable work force that can implement needs 1) and 2)." Ex. 128 at LAD008175, ER556. Its key provisions prohibit older, more polluting drayage trucks from entering POLA. Ex. 128 at LAD008176, ER557. POLA levied a new per-

container fee on cargo owners to fund a partial subsidy for cleaner truck purchases. Ex. 128 at LAD008176, ER557; s*ee ATA-II*, 559 F.3d at 1049.[3]

As part of the CTP, POLA required all LMCs to apply for and, if approved, sign a "Concession Agreement" as a condition of future entry to MTO terminals. Ex. 49, ER520-542. Violations of this requirement result in exclusion from the Port and can be penally enforced under POLA Tariff No. 4 Ex. 177, ER583; Ex. 188, ER712. Prior to the Concession requirement, approximately 16,000 trucks and 1300 LMCs provided drayage service to the Ports. Holmes-IV-175:6-15[ER1007]; Ex. 128 at LAD008176, ER557. As of the trial, roughly 600 LMCs had signed Concession Agreements with POLA. Holmes-IV-176:4-8[ER1008].

POLA designed the Concession Plan as "an extensive attempt to reshape and control the economics of the drayage industry." *ATA-II*, 559 F.3d at 1055. Its principal restructuring goals were to ban all use of IOO drivers and mandate exclusive use of employee drivers, and reduce POLA's costs by re-allocating regulatory administrative burdens from POLA and the MTOs to a few, large LMCs. Ex. 128 at LAD008178, ER559; Ex. 185 fifth "Whereas" clause ¶¶ h, o, p[ER701-703; Freeman-V-135:17-20[ER1024], 138:2-4[ER1025]; Holmes-IV:93:8-23[ER995]; Holmes-V-13:6-

---

[3]    As of trial, POLA collected more than $30 million from the container fee. Freeman-V-126:19-127:8[ER1022-1023].

9

23[ER1012].   These market structure transformations were designed to improve drivers' "wages, benefits, and working conditions." Ex. 185 first "Whereas" clause [ER699] and fifth "Whereas" clause ¶ q[ER703]; *see* Ex. 128 at LAD008176-8177, ER557-558. *See* Ex. 141 at 2, ER563 (objective to "create an orderly drayage market"). POLA's purely economic goals were confirmed at trial by the former BHC President:

> [T]his Clean Truck Program was going to cause some dislocation in the existing industry. I don't think there's any disagreement on anyone's part that what this program was going to do was gonna reform the trucking business at the port.

Freeman-V:144:9-13[ER1026].   Concession Agreement provisions relating to environmental improvements, truck maintenance, and port security merely duplicated regulatory requirements already imposed upon drayage trucks and drivers under federal and state law and existing Port tariffs.[4]

In the preliminary injunction phase of this case, POLA contended:

- POLA operates as a multi-billion dollar commercial enterprise, funded by revenues generated from port operations;[5]

---

[4]    Compare Ex. 49, ER520-542 and Ex. 177, ER576-590.  ATA has not opposed POLA's use of laws or the Tariff to achieve environmental or port safety and security improvements—only their use as a "bootstrap" to avoid preemption of the Concession Agreement. *See ATA-II*, 559 F.3d at 1051. During the period while key Concession Agreement provisions were enjoined, air quality at the Port improved faster than anticipated.  Ex. 232, ER929.

[5]    *See* Dkt. 59, Decl. of Dr. Geraldine Knatz, ¶¶ 8-9[ER434].

- The CTP was intended to overcome legal environmental challenges that hindered Port expansion and increases in revenue;[6]
- The CTP includes three truck funding mechanisms:
  - a truck funding program consisting of grants to help purchase new trucks or retrofit emissions control devices into older trucks;[7]
  - a pre-order assistance program[8] to make available to carriers trucks for purchase on standard terms and conditions; and,
  - a scrap truck buyback payment of $5,000.[9]

---

[6]    Ports' Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. 53) at 4, 7, 9, 22, 26[ER1040]; Dkt. 59 Knatz Decl. ¶ 17[ER437].

[7]    POLA intended to fund these partial financial incentives using proceeds from the tariff's "Clean Truck Fee." *ATA-I*, 577 F. Supp. 2d at 1114.

[8]    This program reserved trucks for purchase by some LMCs, but was not procurement by POLA. "We preordered trucks. We were not really purchasing trucks." Knatz-VI-134:12-19[ER1036].

[9]    *See* Dkt. 57, Decl. of John Holmes ¶ 15[ER293]. *See also* Dkt. 59 Knatz Decl. ¶¶ 28 and 30[ER439-440], declaring that POLA intended to provide carriers with funding from state moneys available under Proposition 1B to replace older trucks servicing the port with new cleaner trucks, and that POLA wanted to assure that funding made available to purchase the new cleaner trucks resulted in sustainable emissions reductions. Thus, the bulk if not all of the funding for clean truck subsidies and grants came not from POLA, but from the State and the container fee. *See* Ex. 128 at LAD008175[ER556]; and Ex. 177, ER576-590.

11

The District Court denied the preliminary injunction. Although holding that the Concession Agreement related to prices, routes, or services, and that POLA was not acting as a market participant by promulgating the Concession mechanism, the District Court believed that since part of the Concession Agreement was responsive to safety, the entire Agreement was exempt from preemption under the Section 14501(c)(2)(A) motor vehicle safety exception.

In *ATA-II*, this Court reversed. While commending the District Court's cogent rejection of POLA's market participant defense, the Court held several Concession provisions were not likely to be justified under Section 14501(c)(2)(A). 559 F. 2d at 1053. On remand, the District Court enjoined the provisions this Court had found likely to be preempted. ER221-262.

ATA and POLA each moved for summary judgment with respect to POLA's market participant defense. POLA's motion relied on the same facts described in the preliminary injunction proceedings (and later presented at trial) including the partial funding grant and the pre-order reserve program. Dkt. 236, ER1040 The Court reserved judgment on all issues, but informed the parties that, having read POLA's supplementary

evidence, she believed her first decision remained correct.   February 25, 2010 Transcript at 5 and 23[ER894-895 and 911].

At trial, ATA presented testimony from, *inter alia*, Messrs. Fred Johring, Joshua Owen, Billy Patterson, and Gregory Stefflre, who were officers of LMCs that engaged in drayage at the Ports, and expert witness Ms. Annette Sandberg, a former Administrator of the Federal Motor Carrier Safety Administration ("FMCSA").   Summarizing the evidence presented at trial, ATA showed:

- The Concession Agreement relates to price, routes, and services, and is preempted under Section 14501(c).  It impermissibly grants POLA discretion to exclude LMCs from providing drayage services on Port routes, and dramatically increases the economics of drayage (including by more than $500 million per year from the IOO ban alone and more than $21,000 per truck for off-street parking).  ER22-23 at ¶17-18; Ex 183 at 70 and 73, ER670 and 673; Ex 191 at 80, ER806.

- POLA is not a "market participant."   POLA procures no drayage services under the Concession Agreement and does not participate in the drayage market.   The Concession Agreement is regulation designed to promote governmental policies, *e.g.*,  to improve public

health, increase driver wages, and offload to the LMCs the administrative expense of regulatory enforcement. Moreover, POLA's partial grant program could not justify regulating the entire drayage industry. Sixty-five percent of new trucks were privately-purchased with *no* government assistance. For the other 35%, POLA-offered subsidies covered only 11% of new truck costs ($20,000 of $180,000). ER29 at ¶ 86; Knatz-VI-130:21-131:16[ER1034-1035].

- POLA could not justify its attempts to restructure drayage industry economics under a motor vehicle safety exception.

POLA presented no substantial new evidence at trial. Relying on the BHC orders, POLA witnesses explained the same reasons behind the CTP and the Concession Agreement, but provided updated numbers regarding offered grants and subsidies.

In *ATA-V*[ER6-62], the District Court reversed its prior legal conclusions. Contrary to its exposition of the law in its initial opinions, the court held several of the Concession provisions did not affect price, routes or services of motor carriers, and that the Concession Agreement was exempt from FAAAA preemption under the market participant doctrine. Finding serious questions going to the merits of this appeal, the District Court stayed

14

its Order and reinstated the injunction against the IOO ban pending the outcome of this appeal.

## SUMMARY OF ARGUMENT

As of October 1, 2008, POLA required any LMC that sought to pick up or deliver customers' cargo containers at privately-operated marine terminals on Port property to apply and be approved for a "Concession Agreement," or be excluded from the Port. That "agreement" regulates virtually every detail of LMC drayage businesses from their financial capability to who may drive the trucks. Congress eliminated such patchwork state regulation of the motor carrier industry through the FAAAA by enacting a broad express preemption of any regulation that relates to an LMC's prices, routes, or services, subject to a few narrowly-defined exceptions.

In *ATA-V*, the District Court reversed this statutorily-prescribed preemption analysis. It narrowly interpreted the preemption statute and expansively construed non-statutory exceptions so as to hold that the Concession Agreement escaped statutory preemption. This holding contravenes the FAAAA, case law precedents, and even the District Court's (and this Court's) own prior pronouncements of law governing this case.

15

1.    The District Court erroneously held the Concession Agreement mechanism and certain of its provisions did not "relate" to price, routes, or services because, in the court's view, a carrier chose to accept the Concession Agreement obligations, and they were not burdensome.  This holding contravened Supreme Court precedent that a provision "relates" to price, routes, or services without burdening carriers, and logic which dictates that imposing pre-conditions on drayage at the Port by definition "relates" to drayage routes and services.

2.    The District Court misconstrued a judicial doctrine, developed in Commerce Clause cases where no preemption statute applies, and held that the Concession Agreement reflects "market participation" rather than regulation.  This expansive interpretation of the market participant doctrine cannot be squared with the congressional directive of broad statutory preemption subject to narrow exceptions.  The court erroneously held the Concession Agreement met the "efficient procurement" test although it recognized POLA procures no drayage services.  Despite precedents requiring courts to narrowly define the "market," the court applied the doctrine to a nationwide "port services" market in which the drayage carriers do not participate, rather than the drayage services market which the Concession Agreement regulates (and in which POLA does not participate).

The court further erroneously held that POLA's administration of government grant money made POLA a "market participant" to regulate 100% of the trucking industry, even though 65% of trucks were privately purchased with no POLA funds, and the other 35% received only 11% of a truck's total cost.

3.    The District Court erroneously held that POLA, under the Concession Agreement, had discretion to revoke an LMC's right to provide drayage at the Port.  Federal law explicitly reserves that discretion to the Federal government.

4.    Finally, the District Court erred by holding that three Concession Agreement provisions were justified under a "motor carrier safety" exception to preemption, regardless of the fact that these provisions, like the Concession Agreement itself, were not genuinely responsive to safety but, rather, were intended to restructure the economics of the drayage trucking business and transfer POLA's enforcement costs to the LMCs.

### STANDARD OF REVIEW

Conclusions of law following a bench trial, and findings of fact that require reference to "the values that animate legal principles," are reviewed *de novo*. *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d

869, 879 (9th Cir. 2005); *United States v. McConney*, 728 F.2d 1195, 1202 (9th Cir. 1984).

## ARGUMENT

**I.     The District Court Erroneously Held that the Concession Agreement and Individual Concession Provisions Do Not Relate to Prices, Routes, or Services.**

In 1994, Congress enacted the motor carrier provisions of the FAAAA to achieve uniform federal regulation of the carriage of freight. Congress adopted an express preemption provision, codified at 49 U.S.C. Section 14501(c)(1), that "a State [or a] political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier." *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 128 S. Ct. 989, 993-995, (2008) (analyzing the history and purposes of FAAAA preemption). Preemption under Section 14501(c)(1) requires that a law or regulatory provision must have a "connection or reference to" motor carrier prices, routes, or services, and that the impact of the law or regulation must be "significant" and not "too tenuous, remote, or peripheral." *Rowe*, 552 U.S. ___, 128 S. Ct. at 995, 998.

"That the Concession agreements relate to prices, routes or services of motor carriers can hardly be doubted." *ATA-II*, 559 F.3d at 1053. The

Concession Agreement regulates minute details of drayage services at the Port, and every LMC without a Concession is denied regular entry to dray cargo at POLA. At trial, LMC witnesses testified that their costs and, to survive, their prices necessarily would increase because of Concession requirements, especially the bans against using IOOs and on-street parking.

The District Court correctly held that the bans on IOO drivers and on-street parking would affect motor carriers' prices, routes, or services. *ATA-V* at ER34-37. However, the District Court erroneously held that the Concession agreement mechanism itself, which gives POLA discretion to exclude non-Concessionaire motor carriers from providing drayage services to and from marine terminals at POLA, escaped preemption. *Id.* at ER35-36 n.6. In addition, the court decided that individual provisions regulating a carrier's financial capability, truck maintenance, and display of placards escaped preemption because they would impose minimal burdens on motor carriers. *Id.* at ER37-38. These erroneous conclusions contradict well-established precedent of the Supreme Court and the Ninth Circuit, and should be reversed.

## A.    Section    14501(c)(1)    Preempts    POLA's    Concession Agreement *in Toto*.

The District Court held twice in its preliminary injunction rulings that the Concession Agreements falls within the preemption provision of the

FAAAA. *ATA-I* at 1117 (noncompliance with Concession Agreement would have a "direct effect" on motor carriers services "because they would be banned from the Ports, and therefore could not provide drayage services to clients there"), *aff'd in part*, *ATA-II* at 1053; *ATA-III* at *20-22. The Concession Agreement scheme pervasively regulates nearly every facet of LMC operations: "hiring decisions, truck routes, parking restrictions, truck maintenance, truck safety, operations regulations, driver health insurance, driver credentials, compliance tags, security, placards posted on trucks, technology, and financial capability." *ATA-I* at 1117. Thus, the District Court held, and this Court affirmed, "the effect of the concession agreements on 'price, route, or service,' would likely be sufficiently non-tenuous and direct to warrant preemption." *Id.* (citations omitted); *ATA-II* at 1053.

POLA was aware, and fully intended, that the Concession Agreement would affect prices. The IOO ban would reduce the number of LMCs performing drayage services, potentially reduce the supply of truckers by 40 percent, increase driver wages, and add $500 million to $1.1 billion to the annual costs of the drayage industry—thereby increasing drayage prices high enough to potentially divert 3% of container traffic to other ports.[10]

---

[10] Ex. 40, ER518-519; Ex. 191, ER726-806; Holmes-V-18:10–19:10[ER1013-1014], 21:19–22:24[ER1015-1016], 23:10-24:7[ER1017-1018], 24:14–25:5[ER1018-1019]. LMC witnesses corroborated these

The requirement of a Concession Agreement *per se* affects routes and services. Using the Concession Agreement, POLA arrogates the ability and discretion to prohibit non-Concessionaire LMCs from providing drayage services to and from marine terminals at POLA. Congress intended deregulation of motor carriers to result in the "'maximum reliance on competitive market forces,' thereby stimulating 'efficiency, innovation, and low prices,' as well as 'variety' and 'quality.'" *Rowe*, 552 U.S. ___, 128 S. Ct. at 995 (*quoting Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992). Accordingly, POLA's ability to prohibit non-Concessionaire LMCs from entering its property, by definition, creates "the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." *Id.*, 552 U.S. ___, 128 S. Ct. at 995; *see ATA-I* at 1117 ("[U]nlike the statute in *Rowe*, which regulated carriers only indirectly, but was nevertheless preempted, the concession agreements here directly regulate the carriers

---

adverse effects, Owen-II-176:11-15[ER962], 177:1-10[ER963]; Owen-III-16:17-25[ER966]; Patterson-III-46:8-12[ER974], 47:1-15[ER975], 54:9-21[ER976]; Johring-III-139:4-17[ER982], 140: 2-6[ER983]; Stefflre-III-181:6-182:12[ER991-992]; and that the IOO ban would result in lower driver productivity and increased maintenance costs. Patterson-III-43:10-14, 43:22-44:2[ER972-973]; Stefflre-III-176:18-177:11[ER986-987].

themselves, *at least to the extent that they wish to access the Ports*."(emphasis added); *ATA-II* at 1053.

Citing *Air Transp. Ass'n of Am. v. San Francisco*, 266 F.3d 1064 (9th Cir. 2001), the District Court concluded that the Concession agreement mechanism does not affect the prices, routes, or services of LMCs because it does not *require* an LMC to serve POLA. *See* ER35-36 at n.6 ("motor carriers continue to be free—as they were before the adoption of the Clean Truck Program—to decide whether to perform drayage services at the Port, but a decision not to do so does not . . . affect their 'routes' or 'services.'"). This conclusion turns on its head congressional intent and Supreme Court precedent, as well as this Court's case law.

First, the Concession Agreement establishes conditions precedent by which gives POLA discretion to determine which LMCs may dray at the Port. Under *Rowe*, that decision should be in the hands of motor carriers and their customers, *i.e.*, the actual participants in the drayage market and those subject to competitive market forces, not a governmental entity like POLA. *See Rowe*, 552 U.S. ___, 128 S. Ct. at 995. For example, the financial capability provision, which the District Court erroneously found to not affect

22

prices, routes or services,[11] requires LMCs to demonstrate their financial capability "to the satisfaction of [POLA's] Executive Director."  Ex. 49 at §III(n), ER525.  The provision's plain purpose is to empower POLA with discretion to exclude LMCs from the Port.  The ordinance in *Air Transp. Ass'n* was different.[12]  It did not give the city discretion to decide which airlines could not serve the airport.  266 F.3d at 1074 ("[t]he ADA allows air carriers to *make their own decisions* about where to fly and how many resources to devote to each route and service").  And, unlike the regulation in *Air Transp. Ass'n*, the Concession mechanism *does* control an LMC's decisions about where to drive and what resources must be devoted to each route and service.

Second, *Air Transp. Ass'n* concerned a municipal ordinance of general applicability to *all* city contracts and, as such, would not be "related to" prices, routes, or services.  266 F.3d at 1072.  Here, the Concession

---

[11]    ER38. This provision further demonstrates POLA's primary purpose to reshape drayage market economics and control the entry of motor carriers onto Port property.  *See* Section D *infra*.

[12]    The sweep of federal preemption applicable to both cases, however, is the same.  The preemptive and jurisdictional scope of the Airline Deregulation Act of 1978 ("ADA") formed the basis of the FAAAA.  *Rowe,* 552 U.S. ____, 128 S. Ct. at 994-95. *See New England Legal Found. v. Massachusetts Port Authority*, 883 F.2d 157, 171, 173 (1st  Cir. 1989) ("Congress obviously did not intend to leave a vacuum to be filled by the Balkanizing forces of state and local regulation").

Agreement *specifically targets* only LMCs performing drayage services at POLA.  Thus, unlike the challenged ordinance in *Air Transp. Ass'n*, POLA's Concession Agreement "was written with [the motor carrier] industry in mind."  266 F.3d at 1072.

Third, the Court in *Air Transp. Ass'n* recognized that the city did not use the challenged ordinance, through its bargaining power, "to force the Airlines to adopt or change their prices, routes or services—the prerequisite for ADA preemption."  *Id.* at 1074.  Here, POLA is using its *regulatory* powers to force LMCs to change their prices, routes, or services.  *See ATA-I* at 1117; ER36.[13]

Given the District Court's erroneous reading of *Air Transport Ass'n*, this Court should reverse the decision below and hold that the Concession mechanism as a whole is preempted.

### B.    The Financial Capability Provision is Preempted Because It Affects the Prices, Routes, or Services of Motor Carriers.

The financial capability provision demands that an LMC demonstrate "to the satisfaction of the Executive Director that it possesses the financial capability to perform its obligations under this Concession over the term of

---

[13]    Whether POLA's actions exercise regulatory powers or contractual leverage is irrelevant.  The same preemption analysis applies "[r]egardless of whether a sovereign uses its police power or its contractual power to impose restrictions."  *Air Transport*, 266 F.3d at 1075.

the Agreement." Ex. 49 §III(n), ER525  The plain language of the provision gives POLA discretion to deny LMCs the right to provide drayage services on routes involving the Port, based solely on POLA's assessment of "financial capability."  Accordingly, the financial capability provision relates to the routes of motor carriers and is therefore preempted.

> **C.    The Maintenance Provision of POLA's Concession Agreement Affects the Prices, Routes or Services of Motor Carriers Because It Regulates the Essential Details of Motor Carrier Services.**

The District Court also allowed the maintenance provision[14] of POLA's Concession Agreement to escape preemption.    ER37-38. According to the District Court, this provision would not affect the prices, routes, or services of motor carriers because it would not be especially burdensome, costly, or have "additional" effects.  *Id.*  This was plain error. As *Rowe* instructs, even non-burdensome provisions affect prices, routes, or services where, as here, they regulate "essential details" of motor carrier business, and "could easily lead to a patchwork of state service-determining laws, rules, and regulations."    *Id.*    Such a "regulatory patchwork is inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace."  *Rowe*, 552 U.S. ___, 128 S. Ct. at 996.

---

[14]    Ex. 49 §III(g), ER524.

25

Under *Rowe*, the relative burden of the provision is irrelevant.  "If federal law pre-empts state regulation of the details of an air carrier's frequent flyer program, a program that primarily *promotes* carriage, it must pre-empt state regulation of the essential details of a motor carrier's system for picking-up, sorting, and carrying goods—essential details of the carriage itself." *Rowe*, 552 U.S. ____, 128 S.Ct. at 996 (emphasis in original).  Here, the challenged provision regulates essential details of drayage services, such as how LMCs must manage equipment used to provide drayage services. *See, e.g.,* Patterson-III-65:2-22[ER981] (testifying that maintenance to manufacturers' specifications requires tracking of manufacturer parts and the elimination of cheaper aftermarket parts); Patterson-III-32:21-36:25[ER967-971] & Ex. 223 §6[ER808] (testifying that the maintenance obligations, even for those trucks operated by IOOs on behalf a LMC are fully governed by existing federal and state regulations); Johring-III-143:2-144:1[ER984-985] (testifying that maintenance provision would result in increased costs and increased rates).  It clearly relates to services as well as their costs (hence prices) and, thus, is preempted.

### D.    The Placard Provision of POLA's Concession Agreement Is Preempted by Section 14506(a).

The District Court similarly erred by narrowly interpreting the Section 14506(a) prohibition against local requirements to force LMC vehicles to post any form of identification on or in a commercial motor vehicle other than those forms required by the Secretary of Transportation. The District Court ruled that the placard provision (Ex. 49 §III(1), ER525) was not preempted by Section 14506(a) because it is not a "form of identification." ER56. This was plain error. The placard provision applies only to trucks that provide drayage services at POLA, and thus constitutes a form of identification.

The rationale in *Rowe* applies with equal force to Section 14506(a) preemption. If every jurisdiction could require LMCs to display a specific telephone number, it "could easily lead to a patchwork of state service-determining laws, rules, and regulations." *Rowe*, 552 U.S. ____, 128 S. Ct. at 996. Patterson-III-58:2-24[ER979] (if every jurisdiction required a separate sticker, an LMC could have "ten or twelve stickers" on each truck). Accordingly, Section 14506(a) preempts the placard provision.

## II.     The District Court's Reversal on the Market Participant Defense Violates Congressional Intent and This Court's Precedent.

The FAAAA evinces explicit and broad congressional intent to preempt state reregulation of the federally deregulated trucking industry, subject only to a few, express, narrow exceptions.  "There can be no doubt that when Congress adopted the FAAAA, it intended to broadly preempt state laws that were 'related to a price, route or service' of a motor carrier. In so doing, Congress intended to avoid the spectacle of state and local laws reregulating what Congress had sought to deregulate."  *ATA-II*, 559 F.3d at 1053 (citation omitted).   This Court stated its concern that a broad interpretation of FAAAA exceptions could "swallow the preemption section itself or, at the very least, cut a very wide swath through it." *ATA-II*,  559 F.3d at 1054.  By reversing its prior view of the law, the District Court's decision realizes this fear.

In *Engine Mfrs. v. S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031 (9th Cir. 2007), this Court addressed the judicially-developed market participant doctrine, concluding that, "[b]ecause the market participant doctrine is not a wholly freestanding doctrine, but rather a presumption about congressional intent, the doctrine may have a different scope under different federal statutes."  *Id.* at 1042.  Due regard for congressional intent requires that the market participant analysis not be "mechanically applied"

28

to every federal statute. *Id.* at 1045. Thus, Congressional expressions of preemptive intent necessarily supervene any contrary precedent under the dormant Commerce Clause, or under other statutes that have no express preemption language.

The market participation doctrine exempts from preemption only a narrow set of conduct in which a government acts similarly to a private economic actor that procures items. *Engine Mfrs.*, 498 F.3d at 1041. The doctrine does not cover government regulatory actions. In *ATA-II*, this Court affirmed that the Concession Agreements were regulatory activities unlikely to qualify as "market participation":

> The Ports claim that their far-reaching Concession agreements are not preempted because . . . they are acting as market participants, even though they are not buyers or sellers of drayage services; or because it is a matter of efficient procurement, even though they do not procure drayage services; or because, despite the breadth of the regulations they seek to impose on the industry, the concession agreements are narrow in scope.

*Id.* at 1053.[15]

---

[15]    In an *amicus* brief filed with this Court in connection with *ATA-II*, the United States called POLA's arguments "meritless," noting that POLA merely controls access to terminal operators and does not itself procure drayage services. Brief for the United States of America as *Amicus Curiae* in Support of Reversal, at 24-25 (CA No. 08-56503 Oct. 20, 2008) ("United States *Amicus*").

None of these facts changed at trial. What changed was the District Court's view of the law. The District Court erroneously applied the market participation defense where POLA does not participate in the drayage services market in which LMCs compete, and LMCs do not compete in the seaport market in which POLA participates; and erroneously found "efficient procurement" where POLA concededly and explicitly procures no drayage services. And while this Circuit and others follow a Supreme Court opinion narrowly defining the relevant market, the District Court essentially eliminated the relevant market concept.

The District Court's sweeping interpretation of the market participant doctrine contravenes both congressional intent that preemption be broad and exemptions narrow, and the precedent of this Circuit. In light of these errors and others discussed below, the District Court erroneously applied the market participation doctrine to exempt the Concession Agreement from federal preemption, and the judgment must be reversed.

## A. The District Court's Initial Opinion Correctly Stated and Applied the Market Participant Doctrine.

In the preliminary injunction phase, the District Court correctly rejected POLA's market participation arguments. *ATA-I*, 577 F. Supp. 2d at 1119-1123. POLA had no legitimate claim to an exemption under the market participant doctrine, the District Court held, because POLA has not

30

pursued "purely proprietary interests." *Id.* at 1119. Thus, POLA's actions could not qualify as proprietary under the tests for either "efficient procurement" or "narrow scope." *Id.* at 1119-1123.

### 1.     The District Court initially correctly held that POLA's Concession Agreement does not constitute proprietary state action.

In *ATA-I*, the District Court correctly observed that the market participant exception to preemption hinges on whether "state action is proprietary, rather than regulatory." 577 F. Supp. 2d at 1119. Whether the state's action is proprietary depends upon whether a challenged action "essentially reflects the governmental entity's own interest in its efficient procurement of needed goods and services." *Id.* (internal punctuation omitted) (quoting *Engine Mfrs.*, 498 F.3d at 1041). As an alternative to this "efficient procurement" test, the District Court stated that it also could consider whether the challenged program has such a "narrow scope" that it defeats "an inference that its primary goal was to encourage a general policy." *Id.* (*quoting Engine Mfrs.*, 498 F.3d at 1041).

### 2.     The District Court initially correctly held that the Concession Agreement does not reflect "efficient procurement."

The District Court initially flatly rejected POLA's assertion that its actions were proprietary under the efficient procurement test. "[D]efendants

are not participants in the relevant market," *ATA-I*, 577 F. Supp. 2d at 1120,

because the Defendants "and motor carriers do not contract directly for the

provision of motor carrier services." *Id.* at 1121.  Rather, the Concession

Agreement is "akin to a licensing scheme, whereby [POLA] license[s] the

motor carriers to do business at [POLA], provided that they follow certain

regulations." *Id.*  "[S]imply addressing the financial interests of a public

entity does not make such efforts those of a market participant." *Id.* (quoting

*Aeroground, Inc. v. City and County of San Francisco*, 170 F. Supp. 2d 950,

958 (N.D. Cal. 2001).

The District Court defined the efficient procurement inquiry as

"whether the law at issue enables the city or state entity to procure goods or

services in order to operate as a business." *ATA-I*, 577 F. Supp. 2d at 1121

(internal citation omitted).  That, in turn, "depends on the definition of 'the

market.'" *Id*. at 1120.  And, the court observed, "it is noteworthy that the

[Supreme] Court has stated that for purposes of the market participation

doctrine, the 'market' should be 'relatively narrowly defined.'" *Id.* (*quoting

South-Central Timber Develop., Inc. v. Wunnicke*, 467 U.S. 82, 98 (1984)

(plurality opinion of Justice White)).

The District Court noted the similarity of this case to *Florida Transp.

Serv., Inc. v. Miami-Dade County*, 543 F. Supp. 2d 1315  (S.D. Fla. 2008).

There, the plaintiffs challenged the Port of Miami's attempt to limit the number of permits given to stevedores who worked at the port. *ATA-I*, 577 F. Supp. 2d at 1123. That court held the market participation doctrine inapplicable because the Port of Miami neither offered stevedore services nor hired stevedores and was "not a 'participant' in the stevedore market." *Florida Transp. Serv.*, 543 F. Supp. 2d at 1332; *ATA-I*, 577 F. Supp. 2d at 1123.[16] In this case, POLA neither offers drayage services nor hires drayage carriers and therefore, the District Court initially held, does not "participate" in the drayage market.

Finally with regard to the efficient procurement test, the District Court found inapposite Commerce Clause cases that POLA relied on (but that, as discussed below, in a 180-degree reversal of its views on the law the District Court later adopted in its Conclusions).[17] The court previously distinguished those cases because they involve situations where a government entity

---

[16]    That opinion recently was superseded by an order that again concludes: "That the County is a participant in the market for port services and owns and operates the Port of Miami does not make the County a participant in the separate market for stevedores. The County does not offer or purchase stevedore services." *Florida Transp. Serv., Inc. v. Miami-Dade County*, 2010 WL 4484094, at *18 (S.D. Fla. Nov. 2, 2010).

[17]    *Four T's, Inc. v. Little Rock. Mun. Airport Comm'n*, 108 F.3d 909 (8th Cir. 1997); *Transport Limousine of Long Island, Inc. v. Port Auth. of N.Y. and N.J.*, 571 F. Supp. 576 (E.D.N.Y. 1983); *Crescent Towing & Salvage Co. v. Ormet Corp.*, 720 So. 2d 628 (La. 1998).

"provides facilities" to private companies.  *ATA-I*, 577 F. Supp. 2d at 1122 n.2.  By contrast, drayage carriers require mere access from public highways to POLA's MTO tenants.

Thus, the District Court initially correctly held that that "defendants are not participants in the relevant market," *ATA-I*, 577 F. Supp. 2d at 1120, and the Concession Agreement does not reflect efficient procurement.[18]

### 3. The District Court also correctly held, initially, that the Concession Agreement does not satisfy the "narrow scope" test.

In *ATA-I*, the District Court also correctly made short work of the narrow scope test, which analyzes whether the challenged action is so narrow that it "defeat[s] an inference that its primary goal was to encourage a general policy . . . ." *ATA-I*, 577 F. Supp. 2d at 1123 (*quoting Engine Mfrs.,* 498 F.3d at 1041).  The test, the District Court emphasized, "protects narrow spending decisions ... that lack the effect of broader social regulation." *Id.*  Given the test's stringent criteria, the District Court noted that "the test was designed to protect 'narrow spending decisions,' which the

---

[18]    The United States *Amicus* brief also rejected POLA's overly broad market definition.  "The Ports' suggestion below that the relevant market is among publicly-controlled ports, all attempting to attract users, is untenable. Governmental action does not lose its regulatory nature simply because it is motivated by a desire to attract certain persons or businesses to a particular jurisdiction." *Id.* at 25.

concession agreements almost certainly are not." *Id.* The court continued that, rather than being narrow, the Concession Agreement contains "numerous provisions regulating different aspects of the motor carriers' services," and applies "to all motor carriers wishing to access the Port[]." *Id.*

This conclusion was correct. POLA's Concession Agreement regulates virtually every aspect of LMC businesses including the hiring decisions they make, their financial capability and recordkeeping obligations, and even where they can park off Port property. The District Court rejected POLA's claim of "narrow" scope, holding that these "numerous provisions" regulate many "different aspects of the motor carriers' services" and "apply to all motor carriers wishing to access" POLA. *ATA-I*, 577 F. Supp. 2d at 1123. Thus, the District Court initially, correctly, held the Concession Agreement reflects "broader social regulation" that cannot meet the narrow scope test. *ATA-I*, 577 F. Supp. 2d at 1119-20.

> **B.      This Court Praised and Affirmed the District Court's Initial Market Participation Discussion, which therefore Became Law of the Case.**

In *ATA-II*, this Court affirmed the District Court's discussion and holding regarding the market participant doctrine, commending "the district court's cogent explanation." 559 F.3d at 1053. The Court characterized the

breadth of POLA's efforts as "an extensive attempt to reshape and control the economies of the drayage industry in one of the largest ports in the nation." *Id.*, 599 F.3d at 1055.

In affirming the District Court's detailed refutation of POLA's market participant defense, this Court rejected arguments POLA made to this Court that (as detailed below) the Conclusions erroneously adopts.  Specifically:

- POLA argued that *Wunnicke*'s requirement to define markets relatively narrowly (initially adopted by the District Court) reflects the views of only a four-Justice plurality.  Opening Brief for Appellees (Nov. 26, 2008) at 56-59.  Despite POLA's thorough briefing, the Ninth Circuit affirmed and commended the District Court's holding.

- POLA's briefs discussed *Tocher,*[19] *Crescent Towing*, *Transport Limousine*, and *Four T's*.[20]  By affirming this Court's holding on the market participant issue, the Ninth Circuit implicitly, if not directly, also rejected POLA's interpretation of those cases.

By affirming the District Court's opinion, this Court also established the District Court's market participation discussion in the preliminary injunction phase as the binding law of the case.  "Any of our conclusions on

---

[19]    *Tocher v. City of Santa Ana*, 219 F.3d 1040 (9th Cir. 2000).

[20]    *See* Opening Brief for Appellees (CA No. 08-56503 Nov. 26, 2008) at 52 (*Tocher*); 62-64, 68-69 (*Four T's*); 63-64, 68-69 (*Transport Limousine*); and 64, 68 (*Crescent Towing*).

pure issues of law . . . are binding." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007) (adopting and quoting 18 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 4478.5 (2002)). "A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal . . . become[s] the law of the case for further proceedings in the trial court on remand and in any subsequent appeal." *Id.*, Federal Practice and Procedure § 4478.5.

As discussed in more detail below, at trial, POLA merely repeated the same legal arguments that this Court already considered and rejected during the preliminary injunction phase. Therefore, the District Court committed legal error by reversing course, adopting POLA's flawed arguments, and ignoring the law of the case during the present permanent injunction phase of this litigation.

### C.  The District Court's Market Participation Conclusions Make Fundamental Legal Errors, and Conflict with this Court's Precedent.

The District Court's Conclusions of Law reverses its own 2008 market participation discussion. The District Court now would hold that the market participation doctrine *does* exempt the Concession Agreement and each of its individual elements from preemption. To reach that mistaken

conclusion, the District Court stacks up a series of erroneous holdings.

Most glaringly, the District Court held that the Port meets the efficient procurement test even though POLA neither participates in the drayage market nor procures drayage services. The District Court erroneously believed that *Wunnicke* is not binding in the Ninth Circuit. Thus, the District Court erroneously held the relevant market is port services (meaning competition among seaports to attract ocean shipping business) nationwide, rather than the narrow market for drayage services at the Port of Los Angeles that the Concession Agreement by its explicit terms cover; any economic activity that affects POLA's revenue qualifies for protection under the market participation doctrine; and actions taken to ward off threatened litigation constitute a valid business necessity that qualifies for protection under the market participation doctrine–even if, as here, the action triggers litigation from other parties.

As explained below, each of these holdings standing alone and taken together should be reversed.

### 1.    The District Court erroneously held that "efficient procurement" does not require actual procurement.

According to the District Court's decision, the market participant test:

applies to non-procurement decisions... . The first prong of the Ninth Circuit's market participant test does not turn on whether the state or local government is a purchaser or seller of the

> goods and services at issue... .  Indeed, a landlord or facilities operator, such as the Port, that does not procure anything, can still take a proprietary action if it is action in pursuit of profit maximization—as a private company would act rather than as a regulator—by limiting access to its land and facilities.

ER48.     Eliminating  "procurement"  from  "efficient  procurement" contravenes Ninth Circuit precedent.  To determine whether state action is proprietary, this Court considers whether the challenged action "essentially reflects the governmental entity's own interest in its efficient procurement of needed goods and services."  *ATA-I*, 577 F. Supp. 2d at 1119 (internal punctuation omitted) (quoting *Engine Mfrs.*, 498 F.3d at 1041).  Here, the District Court conceded that POLA does not engage in procurement related to drayage, describing POLA as "a landlord or facilities operator … that does not procure anything."  ER48.  Absent *any* procurement conduct, POLA cannot engage in *efficient* procurement as the market participant doctrine under *Engine Mfrs.* demands.

Moreover, the precedent cited by the District Court does not support elimination of "procurement" from the test.  In *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794 (1976), Maryland awarded bounty money under a voluntary program to remove, process and discard abandoned cars, but required out-of-state businesses to produce additional documentation

proving that the processed "hulks" originated in Maryland.[21]   Thus, the "market" at issue (for the bounty payments) was created by the State and the regulations affected only those who sought the subsidy.  Here, by contrast, POLA seeks to regulate an entire drayage industry (in which POLA does not participate) that requires nothing more than access to publicly-owned property, and not only LMCs who seek or obtain monetary grants or subsidies from POLA.  POLA's maximum partial subsidy of $20,000 out of the $180,000 average cost of a new truck was given only to one-third of the clean trucks serving the port. ER29 at ¶ 86; Knatz-VI-130:21-131:16[ER1034-1035].  *Alexandria Scrap* does not support a holding that an 11% subsidy given to only 35% of all clean trucks can justify economic regulation of 100% of the drayage trucking industry serving POLA.

*Engine Mfrs. Ass'n* limits the market participant doctrine in this case. There, state regulation of vehicle emissions was preempted under the Clean Air Act as to privately-owned vehicles generally, but applicable under the market participant doctrine only to government-owned vehicles and private vehicles providing services under contract to state or local governments.

---

[21]    *Alexandria Scrap* did not involve an express federal preemption statute under the Supremacy Clause, as is squarely at issue here.  It involved "solely the restrictions upon state power imposed by the Commerce Clause when Congress is silent" regarding preemption.  426 U.S. at 810 n.19.

498 F.3d at 1048-49. By contrast, POLA neither engages in nor contracts for drayage services. *See ATA-I*, 577 F. Supp. 2d at 1120-1121.

Similarly, in *Tocher*, which involved preemption under the FAAAA, the city contracted directly with towing companies for nonconsensual towing services in order to enforce municipal regulations that permitted impoundment of vehicles. The towing services were being "provided exclusively to the City"; thus, the regulation "affects only the relationship between a city and towing companies," "in no way affects the relationship between towing companies and the general public," and "is not a veiled attempt to regulate the motor carrier industry." 219 F.3d at 1049-50 ("because section 14501(c) was uniquely designed to encourage the deregulation of the motor carrier industry, allowing a municipality to act as a private consumer of towing services is entirely consistent with that purpose"). Because POLA through the Concession Agreement did not contract for drayage services, and that agreement only affects its contractual relationships between LMCs and their private sector customers, *Tocher* contradicts a finding that POLA's Concession mechanism falls within the market participant doctrine.

As the District Court wrote during the preliminary injunction phase of this litigation, *Four T's, Inc.* and *Transport Limousine* are inapposite

41

because they involve situations where "an entity . . . provides facilities to entities"; *i.e.,* where the airport leased exclusive use of its real estate and physical facilities to a private company. *ATA-I*, 577 F. Supp. 2d at 1122 n.2. By contrast, drayage carriers require only mere access on Port property from public highways to POLA's MTO tenants; prior to October 1, 2008, drayage carriers had such access without any Concession requirements; and, drayage carriers do not solicit business from POLA or require goods and services from POLA to obtain drayage business.

Finally, *Crescent Towing* also fails to support POLA's arguments. This split decision by a Louisiana state court (issued prior to the Ninth Circuit's binding precedent in *Engine Mfrs.* as well as *Aeroground* and *Florida Transp.*) analyzed two acts that allegedly violated the Commerce Clause: (1) a port commission leasing a dock to a private operator, and (2) the private operator imposing certain tug boat requirements on docking vessels. *Crescent Towing* mentions the market participant doctrine only with respect to the first act, involving competition in a port services market in which POLA clearly participates (and LMCs clearly do not). It thus carries no weight as to POLA's ability to assert the defense in the only market in which ATA claims statutory preemption—the drayage market in which POLA clearly does not participate.

42

In sum, the District Court got it right the first time. None of these cases supports applicability of the market participant doctrine in this case. To the contrary, and not surprisingly, precedent establishes that procurement is an integral part of the efficient procurement test.

> ### 2. The District Court erroneously held that the Supreme Court's *Wunnicke* decision is not binding, despite Ninth Circuit precedent to the contrary.

The District Court failed to follow *Wunnicke* and other precedents requiring courts to define narrowly the relevant market for the market participant doctrine.[22] This was clear error. The Supreme Court has treated *Wunnicke*'s market participant discussion as precedent in *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) (plurality, concurring, and dissenting opinions). This Court relied on the *Wunnicke* plurality opinion in *Big Country Foods, Inc. v. Bd. of Educ. of the Anchorage School Dist.*, 952 F.2d 1173, 1177-78 (9th Cir. 1992). *See Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1062-63 (9th Cir. 1987) (dicta).[23] Thus, *Wunnicke* is binding

---

[22]    "[B]ecause Justice White's opinion [in *Wunnicke*] on the market participant doctrine was supported only by a plurality of the Supreme Court justices, it is not binding." ER49 at n.11.

[23]    Other circuit courts also rely on *Wunnicke*'s discussion of the market participation doctrine. *See, e.g.: **First Circuit:** Antilles Cement Corp. v. Vila*, 408 F.3d 41, 46 (1st Cir. 2005); *Pharm. Research and Mfrs. of Am. v. Concannon*, 249 F.3d 66, 80 (1st Cir. 2001); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 62 (1st Cir. 1999); ***Second Circuit:** Inc. Village of Rockville Center v. Town of Hempstead*, 196 F.3d 395, 398 (2d Cir. 1999); *Automated Salvage Transp., Inc. v. Wheelabrator Environmental Sys., Inc.*,

in the Ninth Circuit.  Indeed, during the preliminary injunction proceedings

of this case, the Ninth Circuit rejected POLA's arguments against *Wunnicke*-

-arguments that the District Court now has erroneously adopted.  *See*

Opening Brief for Appellees (Nov. 26, 2008) at 56-59.

Perhaps recognizing the perils of disregarding precedent, the District

Court attempted to "read[] *Wunnicke* to support its holding here, because the

Port is imposing burdens on the narrowly defined market for Port services

within which it participates as a landlord and facilities operator."  ER49 at

n.11.  But as described next, the District Court improperly focused on the

broad port services market, not the "relatively narrowly defined" market

required by *Wunnicke*.  Under *Wunnicke*, the District Court should have

---

155 F.3d 59, 79 (2d Cir. 1998); *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1282-83 (2d Cir. 1995); *SSC Corp. v. Town of Smithtown*, 66 F.3d 502, 511 (2d Cir. 1995); **Third Circuit:** *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Marketing Bd.*, 298 F.3d 201, 215 (3d Cir. 2002); *Atlantic Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atlantic County*, 48 F.3d 701, 716 n.19 (3d Cir. 1995); *Swin Res. Sys., Inc v. Lycoming County, Pa.*, 883 F.2d 245, 250-251 (3d Cir. 1989) (Becker, J., writing for majority), *see also* 883 F.2d at 257, 258-259 (Gibbons, C.J., dissenting); **Sixth Circuit:** *Huish Detergents, Inc. v. Warren County, Ky.*, 214 F.3d 707, 716 (6th Cir. 2000); **Seventh Circuit:** *Endsley v. City of Chicago*, 230 F.3d 276, 284 (7th Cir. 2000); *Alliance for Clean Coal v. Miller*, 44 F.3d 591, 597-98 (7th Cir. 1995); **Eighth Circuit:** *Red River Serv. Corp. v. City of Minot*, 146 F.3d 583, 586-587 (8th Cir. 1998); *Four T's, Inc.*, 108 F.3d at 912; *Chance Mgmt., Inc. v. State of S. Dakota*, 97 F.3d 1107, 1110-1111 (8th Cir. 1996); *Indep. Charities of Am., Inc. v. State of Minn.*, 82 F.3d 791, 800 (8th Cir. 1996); **Eleventh Circuit:** *GSW, Inc. v. Long County*, 999 F.2d 1508, 1511 (11th Cir. 1993).  Research has not revealed any circuit court cases that reject *Wunnicke*'s analysis on grounds that it comes from a plurality opinion.

focused its analysis on the drayage market, as the only market regulated by the Concession program.

> **3.     The District Court erroneously held that the appropriate market is the one for port services, when precedent limits the appropriate analysis to the narrow drayage services market.**

According to the District Court, the relevant market is one for port services across North America, not for drayage services at POLA.  ER49. POLA's "participation in the port services market is sufficient for its actions in managing its drayage partners[24] to be proprietary, inasmuch as such actions advance its economic interests as a provider of port services."  *Id*. But the market for port services is not the focus of this litigation.  The Concession Agreement only regulates *drayage* services performed on Port property, and LMCs only participate in the *drayage* services market.  Thus, drayage services, not port services, is the only proper "relatively narrowly defined" market to consider.

Other courts have reached similar conclusions.  As discussed *supra*  at 32-33, *Florida Transp.* defined the relevant market as one for stevedore services in which the Port of Miami did not "participate," not the broader

---

[24]     Calling LMCs "drayage partners" demonstrates the District Court's circular reasoning.  As noted above, LMCs do not contract with POLA to provide drayage for the benefit of cargo owners.  They became POLA's "partners" only because of the Concession obligation challenged in this litigation.

market for port services.   In *Aeroground,* the court held an airport's requirement that employers of cargo handlers use a card check rule (a specific way for employees to designate their preferred union representative) had a high probability of being preempted.  *Id.,* 170 F. Supp. 2d at 959. In rejecting the airport's market participant argument, the court noted that "the card check rule is not an effort by the airport to contract directly with Aeroground, or other employers, for goods or services." *Id.* at 957.  The airport's actions could not be "efficient procurement" because the airport was not in the market for cargo-handling services.  *Id.*  It would be a different case, the court noted, if the airport purchased Aeroground's cargo-handling services.  *Id.* at 958.   Because only airlines purchased Aeroground's services, however, the card check regulation was more akin to a licensing scheme that controlled how employers of cargo handlers could contract with the various airlines at the airport.  *Id.*  The same is true here. Because drayage services are acquired under contract for the benefit of cargo owners, and not with POLA, the Concession Agreement constitutes a regulatory scheme preempted under the FAAAA.

*Aeroground* noted factual similarities to *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608 (1986).  *Aeroground*, 170 F. Supp. 2d. at 957.  *Golden State* held as preempted a city requirement conditioning the

46

renewal of taxicab franchises on the settlement of a labor dispute.  475 U.S. at 614.  Later commenting on *Golden State*, the Court indicated that the market participant doctrine might have applied had the city "purchased taxi services from Golden State in order to transport city employees" and imposed the requirement with respect to its own procurement practices. *White v. Mass. Council of Constr. Emp'rs., Inc.*, 460 U.S. 204, 227-28 (1983).  That same key distinction applies here as well.

### 4. The District Court erred by holding that the Concession Agreement is essentially proprietary.

According to the District Court, the Concession Agreement reflects "'essentially proprietary' action under the market participant doctrine, because the Port took the action in order to sustain and promote Port operations."  ER50.  *See* ER53, characterizing the IOO ban as "an economically motivated action … that a private company with substantial market power—such as the oligopoly power of the Port—would take when possible in pursuit of maximizing profit."[25]

---

[25]     The District Court's characterization ignores two crucial points.  First, private businesses attempting to wield market power to reshape the drayage industry as POLA does (*e.g.*, by a collective boycott of IOO drivers) are subject to antitrust laws.  POLA has no antitrust concerns precisely because it acts as a *government* entity engaging in *regulation*.  Second, rational private businesses would not undertake policy-based actions such as the CTP and the IOO and on-street parking bans, that increase the prices they

Such an expansive view could be used to justify any government regulation that promotes any sort of business-like operation. The District Court initially, correctly, rejected that view, holding that, "simply addressing the financial interests of a public entity does not make such efforts those of a market participant." *ATA-I*, 577 F. Supp. 2d at 1121, *quoting Aeroground*, 170 F. Supp. 2d at 958. This Court also correctly understood the "primary concern" underlying POLA's allegedly "proprietary" conduct was "regulating the drayage market," not proprietary action. *ATA-II*, 559 F.3d at 1056.

The District Court's new formulation would now permit the market participant doctrine to do precisely what this Court previously had deemed prohibited. Under the District Court's open-ended rationale, any state government can avoid preemption merely by reshaping market economics and foisting its own regulatory costs on the private sector. The market participant doctrine cannot be stretched so far.

## 5.    The District Court erroneously held that attempts to avert litigation are proprietary actions.

The District Court held that government actions taken "in response to litigation and well-organized pressure from the local community, are also

---

pay for drayage. POLA has no such economic concerns because it is not itself procuring drayage services.

proprietary."  ER51.  If this were the standard, *any* government regulatory action taken in response to actual or threatened litigation would constitute protected proprietary action, inasmuch as any regulatory action can be challenged in court.

The Court cites no legal precedent for this breathtaking proposition. ER50-55.  Such an amorphous standard would eviscerate the principle of federal preemption under the Supremacy Clause.  Indeed, a government entity conceivably might even cooperate with an organization that threatens to sue it, to receive cover that would allow the government to avoid the preemptive force that federal laws would otherwise exert.

Moreover, the District Court disregarded that this Court previously indicated that litigation could not justify protection under the market participation doctrine.  This Court recognized that POLA's "need to address major environmental" issues and avoid opposition from environmental groups was a "principal motivating factor" behind the CTP.  *ATA-II*, 559 F.3d at 1049.  Notwithstanding, this Court affirmed and praised the District Court's initial refusal to apply the market participation doctrine here.[26]

---

[26]     The District Court also ignored that the statutory cause of action previously pursued by Intervenors against POLA applies only against government entities, not proprietary businesses.   California Environmental Quality Act, Cal. Pub. Res. Code §§ 21000, *et. seq*.

**6.    The District Court's decision ignores that POLA's actions seek to advance traditional goals of government, not business.**

The District Court turns a blind eye to the governmental character of POLA's CTP and Concession program.  All three areas covered by these programs are traditional state functions:

**Clean air:**  According to the District Court, "the Port enacted the Clean Air Action Plan, which spawned the CTP and the Concession Agreement, to mitigate Port-generated air pollution from Port-serving vehicles and equipment."  ER51.  Providing clean air for the citizens of a state is a quintessentially governmental function, under the aegis of the California Air Resources Board ("CARB").  *See* Cal. Air Resources Board, http://www.arb.ca.gov/homepage.htm (last visited Dec. 27, 2010).

**Homeland Security:**  The District Court noted POLA's view that "the existing drayage system did not meet the critical needs of the Port . . . with respect to homeland security . . . ."  ER51 n.12 (internal quotation marks omitted).  Providing domestic security is a fundamental government function.  Indeed, Congress mandates the Department of Homeland Security to require and approve MTOs' security plans, including drayage truck provisions and the use of the Transportation Worker Identification Credential.  46 U.S.C. §§ 70103(c)(3)(C), 70105.

**Subsidies:**  The District Court's Findings repeat POLA's arguments that "it has provided $44 million of its own funds in monetary incentives to motor carriers for the purchase of clean drayage trucks, has spent $12.5 million to subsidize the purchase of drayage trucks, [and] has itself paid over $1 million to develop and procure electric trucks for Port drayage."  ER49 n.11.   Governments routinely provide subsidies, tax breaks, and other incentives to encourage people and organizations to undertake socially beneficial actions.   CARB, through voter-approved "Proposition 1B" funding, made available up to $1 billion statewide to replace polluting "goods movement" equipment, including drayage trucks and freight trains serving POLA.  But this does not make CARB a "participant" in each mode of transportation subsidized, any more than the "Cash for Clunkers" program makes the federal government a "participant" in the used car business. *See* Cal. Resources Board, Goods Movement Emission Reduction Program, http://www.arb.ca.gov/bonds/gmbond/gmbond.htm (last visited Dec. 27, 2010).

Accordingly, this Court should reverse the District Court's ultimate conclusion that POLA's actions are proprietary.

### 7.  No allegedly new facts justified the District Court's departure from its initial correct decision.

The District Court sought to explain its about-face on the market-participant doctrine by pointing to allegedly new facts presented at trial. ER52 n.13.  But the facts did not materially change between the preliminary injunction hearing and the trial.  Allegedly new facts cited by the District Court have been a part of the case since the 2008 preliminary injunction proceedings.  POLA consistently has presented evidence in support of its claimed operation as a proprietary business, and based its arguments on its framework of partial grants and subsidies to promote the retirement of older trucks and the purchase of new cleaner trucks.

For example, POLA continuously has contended that it operates as a multi-billion dollar commercial enterprise funded by revenues generated from port operations.  *See* Dkt. 59, Decl. of Dr. Geraldine Knatz, ¶¶ 8-9[ER434]; (POLA is "self-supporting"); *compare ATA-V* (referring to POLA as earning "its revenues for charging fees for services and infrastructure provided to its tenants")[ER50].  POLA also made clear during the preliminary injunction proceedings that the CTP was needed to overcome legal environmental challenges that limited its expansion options and ability to increase revenue.  *See* Ports' Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. 53) at 4, 7, 9, 22, 26[ER1040]; Dkt. 59, Knatz

Decl. ¶ 17[ER437]; *compare ATA-V* (describing POLA's need for expansion, the resulting environmental litigation, and POLA's response)[ER50-51]. POLA presented voluminous evidence that the CTP provided for truck subsidies. *See* Dkt. 57, Decl. of John Holmes ¶ 15[ER293]; Dkt. 53, Opposition to Plaintiff's Motion For Preliminary Injunction (Aug. 20, 2008) at 7 (POLA helps to "finance the retrofits and/or truck replacements"), at 9 (describing CTP's "truck funding program") [ER1040]; *see also* Opening Brief for Appellees (Nov. 26, 2008) at 66-67; *compare* ER49 n.11 (referring to POLA's truck funding initiatives).[27]

The District Court discussed this evidence in previously-published opinions. *See ATA-I*, 577 F. Supp. 2d at 1120. This Court too understood that POLA's claimed need to address environmental issues and avoid opposition from environmental groups motivated the CTP. *ATA-II*, 559 F.3d at 1049.

The Court's cited findings of fact [ER11-32] add insignificant details to evidence POLA relied upon during the preliminary injunction proceedings, essentially providing dollar numbers to the subsidies that POLA previously stated it had intended to spend. But the magnitude of the

---

[27]    *See also* Dkt. 59, Knatz Decl. ¶¶ 28, 30[ER439-440] (declaring that POLA intended to provide motor carriers with funding from state moneys available under Proposition 1B to replace older trucks).

subsidies does not alter their regulatory character.  No new facts justify the District Court's decision to abandon its previous legal holdings.

>    **D.    This Court Should Hold That POLA's Concession Plan Does Not Qualify under the "Narrow Scope" Prong of the Market Participant Doctrine.**

The District Court initially held that POLA's conduct would not meet the narrow scope prong of the market participant test.  Under that test, a government activity can be exempted from preemption if the challenged program has a "narrow scope" that defeats "an inference that its primary goal was to encourage a general policy."  *ATA-I*, 577 F. Supp. 2d at 1119 (*quoting Engine Mfrs.*, 498 F.3d at 1041).   Noting the sweeping scope of the government conduct at issue in this litigation, and the test's stringent criteria, the District Court then held that "the test was designed to protect 'narrow spending decisions,' which the concession agreements almost certainly are not."  *Id.*   Rather than being narrow, the Concession Agreement contains "numerous provisions regulating different aspects of the motor carriers' services, and [applies] to all motor carriers wishing to access the Port[]."  *Id.*

The District Court rested its Conclusions on the efficient procurement test, and declined to address the narrow scope test.  ER46.  Should this Circuit reverse the District Court's efficient procurement holding, there is sufficient basis for this Court to render a decision on the narrow scope

prong, and to find that POLA fails to satisfy that test. The District Court's initial reasoning on this issue continues to apply. The evidence at trial did not change the core facts that were before the District Court, and this Court, during the preliminary injunction phase of this litigation.

If anything, the District Court's efficient procurement holdings strengthen the case against applying the narrow scope test here. The Conclusions emphasizes broad government policies that POLA seeks to advance through the Concession program: Clean air, homeland security, and a retooling of drayage industry economics. There is nothing narrow about these goals. Therefore, this Court need not remand this issue to the District Court,[28] and should instead hold now that POLA does not qualify for the narrow scope test.

## III. The District Court Ignored Statutory and Case Law Reserving to the Federal Government the Right to Revoke Carriers' Ability to Participate in Interstate Commerce at the Port of Los Angeles.

The District Court further erred by holding that POLA, through its Concession Agreement, could exercise discretion to determine which carriers may be denied access to perform drayage services. As shown below, the authority to revoke an LMC's right to engage in interstate

---

[28]   A remand, moreover, would waste judicial resources and delay finality on a matter that already has spawned three appeals.

commerce pursuant to a federally-granted motor carrier license is reserved to the federal government and cannot be exercised by a state or local government entity. Thus, the District Court committed further reversible error by failing to preempt the enforcement provisions of the Concession Agreement.

### A.    POLA Cannot Revoke Drayage Carriers' Interstate Authority on Safety Grounds.

The FAAAA's Section 14501(c)(2)(A) preemption exemption is based on the regulatory *authority* of a state with respect to motor vehicle safety. There is no doubt that, at the time of the FAAAA's passage in 1994, states and their subdivisions did *not* have the right to revoke a LMC's interstate operating authority to enforce state safety rules.[29] *Castle v. Hayes*

---

[29]    The District Court erroneously believed drayage only implicates interstate commerce when cargo is transported outside California. ER58. Drayage operations between POLA and points in California constitute interstate commerce because they are part of the continuous flow of containerized goods between locations outside California and customers in California. *See Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469 (9th Cir. 1997). This Court expressly has found interstate authority to include operations to and from California's ocean ports. *See Lodi Truck Serv., Inc. v. United States*, 706 F.2d 898, 899 (9th Cir. 1983) (approving federal grant of LMC authority to provide services "(1) between ocean ports in California, Oregon, and Washington, and (2) between the ocean ports and inland locations in the same states"). *Lodi* interpreted the 1980 amendments to the Motor Carrier Act, the federal statutory scheme of route-by-route authority in effect at the time of the FAAAA's enactment. *Id.* at 899-900.

*Freight Lines, Inc.,* 348 U.S. 61, 65 (1954) (if interstate LMCs "persistently and repeatedly violate the [safety] laws of a state," it is the responsibility of *federal* regulators to "protect the state's interest" through their enforcement procedures) (emphasis added).  Congress made clear that by limiting the FAAA motor vehicle safety exception to the existing "regulatory authority of a state," it intended no change in scope to the limitations federal LMC law imposed on state safety regulatory powers.[30] And under *City of Columbus v. Ours Garage & Wrecker Serv. Inc.*, 536 U.S. 424 (2002), the authority of political subdivisions over motor vehicle safety under the exemption is derivative of that of their parent states.

### B.    Reform Of Motor Carrier Regulation Did Not Extinguish Exclusive Federal Control Over Safety-Related Suspension Or Revocation Of Interstate Operating Authority.

The existence of express federal statutory revocation procedures was a key reason *Castle* found states did not have independent power to make safety-related revocations.  *Id.*, 348 U.S. at 63-64.  Notwithstanding, throughout this proceeding, the District Court summarily rejected arguments

---

[30]    *See Ours Garage,* 536 U.S. at 438, ("It is the expressed intent of § 14501(c)(2)(A) that the preemption rule of § 14501(c)(1) 'not restrict' the *existing* 'safety regulatory authority of a State'" with respect to motor vehicles) (emphasis in original).

of ATA and the United States[31] that the underlying statutory authority prohibiting states from revoking interstate LMC rights remains intact.  In *ATA-I,* the District Court stated that *Castle* no longer was controlling because it "was decided forty years before the passage of the FAAA and the safety exception, and involved a significantly different factual scenario than the one at issue." *ATA-I,* 577 F. Supp. 2d 1110, 1125. The district court's subsequent rulings relied on this superficial conclusion. *See ATA-III,* 2009 WL 1160211 at *4; *ATA-V*, ER56.

This conclusion was, and remains, erroneous.  The federal motor carrier entry/revocation scheme in general, and its *safety* scheme in particular, continues today as in 1994.

When Congress enacted the FAAAA on August 23, 1994, the Motor Carrier Act incorporated the Interstate Commerce Commission ("ICC")-administered system of route-by-route grants of operating authority that had been the subject of *Castle*.  *Three days later,* on August 26, 1994, Congress enacted the Trucking Industry Regulatory Reform Act of 1994, Public Law No. 103-311, Title II ("TIRRA").  That Act removed the need for route-specific public interest findings for LMCs (which protected incumbent

---

[31]    The United States *Amicus* brief also argued that *Castle* and its progeny remain fully in force. *Id.* at 9-10.

58

carriers from competition),[32] permitting the ICC to grant an LMC nation-wide interstate operating authority if it demonstrated it met safety and insurance requirements.[33]

By enacting the FAAAA and TIRRA simultaneously, Congress did not empower local governments to thwart nation-wide grants of entry through expansive use of the safety exemption. As this Court held, "There can be no doubt that when Congress adopted the FAAAA … Congress intended to avoid the spectacle of state and local laws *reregulating what Congress had sought to deregulate.*" *ATA-II,* 559 F.3d at 1053 (emphasis added).

The 1995 ICC Termination Act, Pub. L. No. 104-88 ("ICCTA"), made *no* changes in the substance of entry and safety regulation of LMCs of property. Rather, it continued federal control over the granting, suspension, and revocation of interstate authority on safety grounds. In so doing, the ICCTA simply renamed "certificates" as "registrations," and consolidated LMC regulatory authority (including safety fitness determinations) under the

---

[32]    TIRRA simply inserted "as a motor common carrier of household goods or passengers" into the requirement for route-by-route authority. *See* statutory App. B, § 2 (49 U.S.C. § 10922(f)).

[33]    The only entry requirements were compliance with safety regulations, a DOT safety fitness finding, and compliance with minimum insurance requirements. Pub. L. No. 103-311 § 207; 108 Stat. 1678.

Secretary of Transportation (now delegated to the FMCSA).[34]    A comparison of statutory language before the FAAAA and after ICCTA reform demonstrates that the fundamental non-economic entry and revocation framework remained intact—just without the ICC.[35]

Congress confirmed and expanded the exclusive federal role in determining interstate LMC safety fitness by enacting the MCSA.[36]    A comparison of the original MCSA language with its post-ICCTA codification again demonstrates the continuity of federal authority over safety fitness determinations. *See* Statutory App. C.

The California Legislature itself contemporaneously confirmed that the federal prohibition on a state's ability to revoke an LMC's interstate

---

[34]    *See, e.g., Klitzke v. Steiner Corp.,* 110 F.3d at 1467 n.2 ("The ICC Termination Act, … reorganized the Interstate Commerce Act, eliminating some provisions and moving many of those that remain to other places in Title 49."); H.R. Rep. No. 104-311, at 84 (1995) *as reprinted in* 1995 U.S.C.C.A.N. 793 (1995) (The ICCTA "eliminates and then reenacts a revised Motor Carrier Act.").

[35]    For a detailed comparison, *see* Statutory App. B (comparing relevant sections of the pre-reform Motor Carrier Act and Motor Carrier Safety Act of 1984 ("MCSA") with those same sections following enactment of:  (a) the FAAAA and the TIRAA; and (b) the ICCTA). These analyses were presented to the District Court.  Dkt. 284, ATA Trial Br. at 19-25, ER1040.

[36]    Pub. L. No. 98-554, Title II, 98 Stat. 2829, which was recodified *just two months* prior to enactment of the FAAAA. Pub. L. No. 103-272 § 1(e), 108 Stat. 745, 983-1013 (July 5, 1994) (*e.g.,* codifying MCSA Section 215 as 49 U.S.C. § 31144 (federal control over LMC safety fitness)).

operating authority survived FAAAA, TIRRA, and the ICCTA. Under the Motor Carrier Safety Improvement Act, 1996 Statutes, ch. 1042   (which was intended to exercise California's residual safety power, *id.* § 1.5), if the California Highway Patrol determines that an LMC has engaged in a "consistent failure" to comply with safety requirements "so as to justify a suspension or revocation of the motor carrier's motor carrier permit … *for interstate operators*, the [Highway Patrol] shall *recommend* to the Federal Motor Carrier Safety Administration that appropriate administrative action be taken against the carrier…." Cal. Veh. Code § 34505.6(a) (emphasis added).[37] And, by definition, POLA can have no greater power to suspend or revoke an LMC's interstate authority than does California.

In sum, the District Court committed legal error when it held that POLA could undertake via the Concession mechanism what federal law would not permit it to do directly. Thus, the District Court's determination must be reversed and the enforcement provisions of POLA's Concession Agreement (Schedule 4, section 4.4) permanently enjoined.

---

[37]    Prior to its 1996 amendments, the section had required the Highway Patrol to recommend to federal regulators "that appropriate administrative action be taken against the carrier's Interstate Commerce Commission operating authority." *See* West's Ann. Cal. Veh. Code § 34505.6, Historical and Statutory Notes.

61

## IV.   The District Court Improperly Applied the Motor Vehicle Safety Exception to Preemption to Provisions Not Genuinely Responsive to Safety.

Although the District Court attempted to justify its holding with statements from BHC Orders, the evidence at trial demonstrated that the BHC's conclusory pronouncements were arbitrary and capricious, and without factual basis.[38]  For example, the BHC adoption of the Concession Agreement demonstrates an utter failure by POLA or the BHC to review or rely upon concrete safety data or analysis.   Sandberg-II-52:1-14[ER954]. POLA Deputy Director John Holmes, who drafted the only parts of the BHC-adopted Concession recommendation giving passing mention to safety, reviewed no motor vehicle safety studies and has neither training nor expertise in motor vehicle safety.   *Id.*; Holmes-IV-130:17-131:12[ER999-1000]; Ex. 224, ER828-838. POLA Executive Director Knatz had no familiarity with FMCSRs. Knatz-VI-143:13-15[ER1037].  POLA made no studies concerning motor vehicle safety and maintenance before adopting the Concession, and presented no safety or maintenance data to the BHC.

---

[38]    The District Court's erroneous reliance on these conclusory statements is further exacerbated by its refusal to permit full discovery into the existence of supportive facts, sustaining POLA's "deliberative process privilege" claim. Dkt. 221, ER171-189; Dkt. 238, ER 158-170.

Holmes-IV-131:13-24[ER1000];  Brown-VI-100:10-13[ER1033].[39]   Outside

consultant reports presented to the BHC before adopting the Concession,

contain no data relating to motor vehicle safety. Ex. 191, ER726-806. POLA

commissioned only economic studies before adopting the Concession.

Holmes-IV-131:13-24[ER1000]; Ex. 183, ER591-698; Ex. 191, ER726-806.

Thus, as noted *supra*  at 8, 50-51, it is no surprise that the BHC's purpose

behind the CTP focused on generic public interest needs (*e.g.*, environment

and regional commerce).  Ex. 128 at LAD008175, ER556.

For these reasons, and as shown below, the District Court erroneously

held that two provisions of the Concession Agreement could be justified

under the Section 14501(c) motor vehicle safety exception.

### A.    The Maintenance Requirements Are Not Genuinely Related To Safety.

The maintenance plan requirement merely repeats obligations already

required by federal law, with one significant exception.  The provision

mandates compliance with a "manufacturer's instructions" regarding

maintenance.  Ex. 49 § III(g), ER524.  POLA provided neither data nor

cogent explanation of any safety rationale behind a requirement to comply

with  manufacturers'  instructions,  over  and  above  existing  federal

---

[39]    The BHC received no independent information apart from Port staff
reports. Freeman-V-85:24–86:15[ER1020-1021].

regulations. Sandberg-II-59:8-19[ER958]. Manufacturers typically "instruct" the use of higher-priced parts made by that manufacturer, which reflect profit motives rather than safety concerns. *See* Sandberg-II-56:7–58:23[ER955-957]; Patterson-III-56:2-16[ER977]; Johring-III-143:7-20[ER984].

There is no evidence that the Concession provision was intended to respond to any holes in the federal safety regulatory scheme, since POLA did no study or analysis of the sufficiency of federal and state safety regulatory requirements prior to adopting subsection III(g). Holmes-V-6:18-23[ER1011]. A comprehensive federal maintenance plan requirement already exists, and is tailored precisely by type of trucking operation. Sandberg-II-56:11-24[ER955]. And Section III(h) already requires adherence to existing federal and California safety standards.

According to POLA, this provision responded to the environmental aspects of the CTP,[40] and to protect the value of the Port's investment in clean truck subsidies. Ex. 128 at LAD008177[ER558]; Ex. 185 fifth "Whereas" clause ¶¶ b, t[ER700, 703-704]; Holmes-IV-106:5-15[ER996]. Any maintenance or safety benefits relating to this provision were achieved

---

[40] For example, provision (g) requires maintenance of "retrofit equipment," which relates only to emissions and not safety. Ex. 49, ER524; Holmes-IV-153:9-23[ER1004].

by the ban on older trucks, which was effectuated by Tariff No. 4, not this provision.  Holmes-IV-106:16-22[ER996]; Brown-VI-96:23-25[ER1032].

### B.    The Placard Requirement Is Prohibited By Section 14506(a), Which Has No Safety Exception.

The placard requirement in POLA's Concession mechanism is preempted by 49 U.S.C. § 14506[41] and the Supremacy Clause because it requires a LMC to display a form of identification on a commercial motor vehicle other than the forms of identification required by the Secretary of Transportation. Ex. 49 § III(l), ER525.  The District Court ignored these requirements and rationales and, instead, based its decision on a constrained view of the broad term "any form of identification."  A placard linking a truck to the Port is beyond question a form of identification.  *See supra* at 27.

Section 14506 contains no safety exception but, as Ms. Sandberg explained, the law precluding use of additional placards has its own genuine safety rationale. If POLA can require the use of additional placards, so could any other of the hundreds of jurisdictions in which a truck may operate across the United States. Multiplying the number of placards reduces the public's ability to clearly read the federally-mandated DOT number, and results in confusion rather than any safety benefit.  Sandberg-II-62:14–

---

[41]    *See* Statutory App. A.

63:10[ER959-960],    130:11-21[ER961].    See    also    Patterson-III-57:9–

59:5[ER978-980]; Hall-VI-52:4-6[ER1031].]

Moreover, the placard provision was not adopted to promote safe

driving on Port premises. It was designed to mollify complaints by the

surrounding community, including complaints concerning truck emissions,

where POLA exercises no regulatory authority. Ex. 224 at 4, ER831;

Holmes-IV-142:12-17[ER1001]  (recommendation  to  BHC  referred  to

concerns from community members off Port property). POLA did not

identify a single reported truck incident that occurred on Port property. Ex.

326, ER884-890.  Mr. Holmes had no knowledge of any calls that came

from  on  Port  property.    Ex.  326,  ER884-890;  Holmes-IV-143:12–

144:12[ER1002-1003]. To the contrary, the most specific information in Ex.

326  complains  of  off-port  conduct.  Moreover,  POLA's  issuance  of

permanent stickers as placards shows its intent to address conduct occurring

off  the  port.  Holmes-IV-109:13–110:6[ER997-998],  144:13-20[ER1003];

Knatz-VI-145:21-146:9[ER1038-1039].

## CONCLUSION

The judgment should be reversed, and the Concession Agreement should be held to be preempted *in toto* under 49 U.S.C. Section 14501(c).

Respectfully submitted,

DATE:    December 28, 2010    SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, LLP

By: /s/ *Christopher C. McNatt Jr.*
Christopher C. McNatt Jr.

*Attorneys for American Trucking
Associations, Inc.*

### Statement of Related Cases - Circuit Rule 28-2.6

I, certify that pursuant to Ninth Circuit rule 28-2.6, that the following matters are related to this appeal.

08-56503 – *American Trucking Associations, Inc. v. City of Los Angeles, et al* - Prior preliminary injunction appeal in this matter.

09-55749 – *American Trucking Associations, Inc. v. City of Los Angeles, et al* - Prior preliminary injunction appeal in this matter.

Dated:  December 28, 2010           SCOPELITIS, GARVIN, LIGHT,
                                     HANSON & FEARY, LLP

                          By:    *s/ Christopher C. McNatt, Jr.*
                                 Christopher C. McNatt, Jr.
                                 Attorneys for Plaintiff-Appellant
                                 American Trucking Associations, Inc.

## Statutory Appendix A

**49 U.S.C. § 14501(c)** provides, in pertinent part:

Motor Carriers of Property. - (1) General rule. - Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier … with respect to the transportation of property.

(2) Matters not covered. - Paragraph (1)—

(A) shall not restrict the safety regulatory authority of a State with respect to motor vehicles. . . .

**49 U.S.C. § 14506(a)** states:

No State, political subdivision of a State, interstate agency, or other political agency of two or more States may enact or enforce any law, rule, regulation standard, or other provision having the force and effect of law that requires a motor carrier . . . to display any form of identification on or in a commercial motor vehicle . . . other than forms of identification required by the Secretary of Transportation . . . .

## Statutory Appendix B

**1.    Entry:**

**49 U.S.C. § 10922(a) (1978)**: . . . the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II … of chapter 105 of this title as a motor common carrier . . .
if the Commission finds that--,

(1) the person is fit, willing, and able--,

    (A) to provide the transportation to be authorized by the certificate; and

    (B) to comply with this subtitle and regulations of the Commission; and

(2) the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity.

**49 U.S.C. § 13902(a)(1) (1996)**: . . . the Secretary [of Transportation] shall register a person to provide transportation subject to jurisdiction under subchapter I of chapter 135 of this title as a motor carrier if the Secretary finds that the person is willing and able to comply with—

(A) this part and the applicable regulations of the Secretary and the [Surface Transportation] Board;

(B) any safety regulations imposed by the Secretary and the safety fitness requirements established by the Secretary under section 31144; and

(C) the minimum financial responsibility requirements established by the Secretary pursuant to sections 13906 and 31138.

## 2.      Requirement of Route-by-Route Authority (Before and After Trucking Industry Regulatory Reform Act of 1994)

**49 U.S.C. § 10922(c) (1978)**:  (1) Subject to section 10927(a) of this title, each certificate issued to a person to provide transportation as a motor common carrier shall specify—

(A) the transportation to be provided by the carrier;

(B) any of the regular routes over which, any of the places between which, and off-route places at which, the carrier may provide transportation; and

(C) if transportation is not over regular routes or between specified places, the area in which the carrier may provide transportation. …

**49 U.S.C. § 10922(f) (1995)**:  (1) Subject to section 10927(a) of this title, each certificate issued to a person to provide transportation as a motor common carrier *of household goods or passengers* shall specify—

(A) the transportation to be provided by the carrier;

(B) any of the regular routes over which, any of the places between which, and off-route places at which, the carrier may provide transportation; and

(C) if transportation is not over regular routes or between specified places, the area in which the carrier may provide transportation. . . .

(Emphasis added).

### 3.    Revocation

**49 U.S.C. § 10925(c) (1978**): (1) . . . the Commission may revoke a certificate or permit of a motor carrier . . . only after the Commission has issued an order to the holder under section 11701 of this title requiring compliance with this subtitle, a regulation of the Commission, or a condition of the certificate, permit, or license of the holder, and the holder willfully does not comply with the order.
…
  (3) The Commission may act under paragraph (1) or (2) of this subsection only after giving the holder of the certificate, permit, or license at least 30 days to comply with the order.

**49 U.S.C. § 13905(c) (1996)**:[42] . . . the Secretary may revoke a registration of a motor carrier . . . only after—

  (1) the Secretary has issued an order to the registrant under section 14701 requiring compliance with this part, a regulation of the Secretary, or a condition of the registration; and

  (2) the registrant willfully does not comply with the order for a period of 30 days.


Sources:  Motor Carrier Act of 1935, as codified in Title 49 U.S.C. by Pub. L. No. 95-473 (1978); Title 49 U.S.C., as of January 1995 and January 1996 (WestLaw).

---

[42]  Currently, 49 U.S.C. § 13905(e).

## Statutory Appendix C

**49 U.S.C. app. § 2512(d) (1984)**： . . . the Interstate Commerce Commission (1) shall find any applicant for authority to operate as a LMC to be unfit if the applicant does not meet the safety fitness requirements established under subsection (a) of this section, and (2) shall deny such application.

**49 U.S.C. § 31144(b) (1996)**: The Secretary shall find that a person seeking to register as a LMC is unfit if such person does not meet the safety fitness requirements established under subsection (a) and shall not register such person.

Sources:  Motor Carrier Safety Act of 1984 § 215, Pub. L. No. 98-554, Oct. 30, 1984, 49 U.S.C. app. § 2512; Title 49 U.S.C., as of January 1996 (WestLaw).

**Certificate of Compliance Pursuant to Fed. R. App. P. 32(a)(7)(C) and
Circuit Rule 32-1 for Case Number 10-56465**

I, certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth
Circuit rule 32-1, the attached opening brief is proportionally spaced, has a
type face of 14 points or more and contains 13,895 words.

Dated:  December 28, 2010              SCOPELITIS, GARVIN, LIGHT,
                                       HANSON & FEARY, LLP


                              By:    _s/ Christopher C. McNatt, Jr._
                                     Christopher C. McNatt, Jr.
                                     Attorneys for Plaintiff-Appellant
                                     American Trucking Associations, Inc.

74

CERTIFICATE OF SERVICE

I, hereby certify that on December 28, 2010, I electronically filed the forgoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. Upon their written consent I have e-mailed the foregoing to the following non-CM/ECF participants (some listed persons may also be CM/ECF participants):

FOR DEFENDANTS THE CITY OF LOS ANGELES, THE HARBOR DEPARTMENT OF THE CITY OF LOS ANGELES, and THE BOARD OF HARBOR COMMISSIONERS OF THE CITY OF LOS ANGELES

Steven S. Rosenthal
Alan K. Palmer
Tiffany R. Moseley
David L. Cousineau
Susanna Y. Chu
Kaye Scholer, LLP
The McPherson Building
901 Fifteenth Street, N.W.
Washington, DC 20005-2327
srosenthal@kayescholer.com
apalmer@kayescholer.com
tmoseley@kayescholer.com
dousineau@kayescholer.com
schu@kayescholer.com

Thomas A. Russell
    General Counsel
Joy M. Crose
    Assistant General Counsel
Simon M. Kann
    Deputy City Attorney
LA City Attorney's Office
425 South Palos Verdes Street
San Pedro, California 90731
trussell@portla.org
jcrose@portla.org
skann@portla.org

Bryant Delgadillo
Kaye Scholer, LLP
1999 Avenue of the stars, Suite 1700
Los Angeles, CA 90067
bdelgadillo@kayescholer.com

FOR DEFENDANTS-INTERVENORS NATURAL RESOURCES
DEFENSE COUNCIL, INC., SIERRA CLUB and COALITION FOR
CLEAN AIR

David Pettit
Melissa Lin Perrella
Adriano Martinez
Natural Resources Defense Council, Inc.
1314 Second Street
Santa Monica, California 90401
dpettit@nrdc.org
mlinperrella@nrdc.org
amartinez@nrdc.org


*/S/ Christopher C. McNatt, Jr.*
Christopher C. McNatt, Jr.